88 P.3d 1078 (2004)
Lisa Marie EVANS, Appellant,
v.
Nathan McTAGGART, Appellee,
Arthur and Rebecca McTaggart, Intervenors/Appellees.
No. S-10554.
Supreme Court of Alaska.
April 9, 2004.
*1079 Craig B. Partyka, Cook Schuhmann & Groseclose, Inc., Fairbanks, for Appellant.
Marlin D. Smith, Law Office of Marlin D. Smith, Fairbanks, for Intervenors/Appellees Arthur and Rebecca McTaggart.
Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

OPINION
MATTHEWS, Justice.

I. INTRODUCTION
The main questions presented relate to parental rights in cases where third parties make child custody and visitation claims. As to custody what must be proved is clear parental unfitness or that the welfare of the child requires third-party custodybut is the preponderance of the evidence standard or a higher standard required? As to visitation, a statute requires proof that the best interests of the child will be served, but is this an unconstitutional interference with parental prerogatives? We answer that the clear and convincing evidence standard of proof is required as to dispositive findings in both instances. This elevated standard is needed, and is adequate, to protect parental rights.

II. FACTS AND PROCEEDINGS
Lisa Evans is the mother of Shawn Evans and Cameron McTaggart. Shawn was born in 1992. Shawn's father, Eric Evans, was married to Lisa until they divorced in 1994. Cameron was born in November 1993. Cameron's father, Nathan McTaggart was never married to Lisa, though they lived together periodically until November 1996. Arthur and Rebecca McTaggart ("the McTaggarts") are the parents of Nathan McTaggart.
This action was initiated in 1997 by Nathan, who filed a complaint against Lisa seeking custody of Cameron and child support from Lisa. Nathan accompanied the complaint with a motion seeking interim and permanent custody of Cameron. Lisa answered, opposed Nathan's motion, and sought an order recognizing her custody. In November 1997 the superior court entered a temporary order that provided that Nathan and Lisa would share legal and physical custody of Cameron. Both parties were required to cooperate with the court-appointed child custody investigator.
The McTaggarts moved to intervene in June 1998. They claimed that they had close contact with Cameron and that "[t]hey believe that such contact is in Cameron's best interest." The final two paragraphs of Rebecca McTaggart's affidavit stated:
My husband and I are now of the opinion that we cannot insure continued contact with Cameron without an order from the Court. We are equally concerned about Shawn, but understand that there may be legal impediments to the Court ordering visitation with Shawn.
Arthur and I reluctantly but respectfully request that you permit us to intervene in this case so we can participate at trial and look out for the best interests of our grandchildren.
The court granted the McTaggarts' motion to intervene. Just prior to the scheduled trial the parties agreed to settle the case. They entered into a child custody and support *1080 agreement that was approved by the court. Under the agreement the parties would have equal shared physical custody on a one-week-on-one-week-off basis. Nathan has a bi-polar disorder and Lisa suffers from hypoglycemia. Recognizing these conditions, the agreement provided that Nathan should remain on medication recommended by his physician and that Lisa "should consistently seek medical treatment for herself ... and follow the treatment recommended by her physician." Lisa was required to "take her medication consistently and follow her prescribed diet." The agreement gave Rebecca McTaggart and Lisa's mother a supervising role over Nathan and Lisa, stating: "Cameron's maternal grandmother, Phyllis Dickman, and his paternal grandmother, Rebecca McTaggart, shall monitor mother and father respectively, during the custody periods to make sure the parents are taking their medication and following their physician's recommendations concerning therapy and diet." Child support was to be calculated pursuant to the shared custody schedule of Civil Rule 90.3(b). The parties were to exchange child support guidelines affidavits and specified income information.
Some two and a half years later, in February 2001, Lisa filed a motion to modify the custody and support agreement. She sought primary custody of Cameron, claiming that changed circumstances justified the modification. Nathan opposed the motion. The McTaggarts again moved to intervene. Their unopposed motion was granted. The superior court ordered a custody investigator to submit recommendations to the court. The custody investigator filed a report in September 2001 that included a recommendation that Rebecca McTaggart be granted custody of Cameron and suggested that Shawn spend time with the McTaggarts. Soon thereafter, the McTaggarts filed a motion for custody of Cameron and for rights of visitation with Shawn. Lisa and Nathan separately opposed this motion.
Following a four-day trial, the superior court in March 2002 entered findings of fact, conclusions of law, and an order that granted legal and physical custody of Cameron to the McTaggarts subject to visitation rights in Lisa. The order required both Lisa and Nathan to pay the McTaggarts $50 per month for child support of Cameron. The order also granted visitation to the McTaggarts with Shawn for one weekend each month during the school year and three weekends each month during summer school vacation. The specified weekends are weekends that Cameron will also be with the McTaggarts.
The court's findings supporting the order begin by detailing the terms of the child custody and support agreement of August 1998. They note that the 1998 agreement was based in part on the court child custody investigator's report which stated:
Neither parent appears capable of meeting Cameron's needs without the assistance of extended family.... Cameron should not be used as a rope in a tug-of-war between the parties or families. All involved need to work together cooperatively to see that his needs are met and that he does not lose the important relationships in his life.
Referring to the statement that "Cameron should not be used as a rope in a tug-of-war between the parents and families," the court found that "that's exactly what has happened." The court also found that Cameron was at high risk:
He is an emotionally disturbed child with special needs and these are a result of his environment over the past eight years and the emotional way that his parents have cared for him and not cared for him. At the present time and in the past Cameron has always had a need for, but it has not been provided for him, stability, consistency and nurturing.
The court found that Nathan was incapable of meeting these needs for stability, consistency and nurturing. The findings continue:
There are two things Cameron needs. He needs the physical and emotional stability of one home; and he needs the battle to stop. I see absolutely no likelihood the battle will stop.... Lisa doesn't want it to happen. Nathan doesn't really want it to happen.
Concerning Lisa, the court found that she "is not presently capable of meeting Cameron's needs" and that she "continues to use Cameron and Shawn Evans as a weapon of her *1081 anger and spite toward Nathan." The court found that Lisa had limited cognitive ability, that she was uninvolved in Cameron's school, unaware of his homework assignments, and that she had neglected to seek needed dental care for him.
The written findings were prepared by counsel for the McTaggarts, and mostly adhere to the oral findings made by the trial court at the close of the evidence. One finding prepared by counsel reads as follows: "I find specifically when I look at the parents, Nathan and Lisa, that it would be clearly detrimental for Cameron to be placed in their home." The court crossed out "clearly" and initialed the cross-out.
The court made the following findings concerning the McTaggarts: "I find that Arthur and Rebecca McTaggart have come forward in this custody case reluctantly. They have done what most grandparents do which is hope that the kids would come through. They have waited and been safety nets for Cameron and at this stage Cameron's condition has changed sufficiently that it requires a change in custody." The court found that Cameron's need for stability "can only be met in Arthur and Rebecca McTaggart's home." Summing up, the findings state:
Cameron has higher need for consistency. He doesn't take change well and, in fact, he shouldn't have a lot of change. This is a little boy that for many years now has needed and now needs dinner at the same time, bedtime at the same time, rules that are enforced the same everywhere and he is only going to progress if he has those things and if he doesn't it is very clear from the testimony he's going to get sicker mentally and accelerate his worsening behavior.... Therefore, this court finds, based upon a preponderance of evidence, that it would be detrimental for Cameron McTaggart to be placed with Nathan or Lisa, and legal and physical custody is granted to Becky and Art McTaggart.
Concerning Shawn, the court found that Arthur and Rebecca McTaggart have been psychological grandparents to Shawn and that "it is in Shawn's best interests that he have as much time with Cameron McTaggart, his half-brother, as possible and that he be allowed to resume his relationship with Arthur and Rebecca McTaggart with some limited visitation." The court also found that the McTaggarts had a "very caring and nurturing relationship with [Shawn] as a small child, and it was and continues to be a loving relationship." The court found that the McTaggarts were not trying to take Shawn "away from Lisa in any way," but that they were trying to "provide him with more love and security and a safety net just like they have with Cameron."

III. DISCUSSION

A. Custody of Cameron McTaggart
Lisa challenges the superior court's award of custody of Cameron to the McTaggarts on three grounds, one factual and two legal. She contends (1) that the court's finding that it would be detrimental to Cameron to place him with Lisa is clearly erroneous, (2) that the McTaggarts lacked standing to seek custody, and (3) that the superior court should have applied a heightened standard of proof. We conclude that the court's finding concerning detriment is adequately supported by the evidence, that the McTaggarts had standing, but that the superior court erred in applying a preponderance of the evidence standard. We address the legal points first.

1. Standing
In Buness v. Gillen, we held "that a non-parent who has a significant connection with the child has standing to assert a claim for custody."[1] Lisa argues that the significant connection test used in Buness requires that the non-parent have actually assumed the status and obligations of a parent in order to meet the significant connection test. In other words, the non-parent must have assumed psychological or in loco parentis status.[2]
*1082 While we question whether the significant connection test was intended to be merely another way of expressing psychological parent or in loco parentis status, we need not flesh out the meaning of the significant connection test in this case. Lisa did not object to the McTaggarts' intervention or motion for custody on standing grounds.[3] We therefore consider Lisa to be precluded from raising on appeal an objection on standing.[4]

2. Standard of proof
Lisa argues that the court applied an inappropriate standard of proof when it found by a preponderance of the evidence that placing Cameron with Lisa would be detrimental to him. She contends that under Alaska law the proper standard is either "clear evidence" or "clear and convincing evidence." She also argues that the lower standard "likely violates Lisa's constitutional right to raise her son."
The McTaggarts argue that the preponderance of the evidence standard was appropriate and not a violation of Lisa's constitutional rights because they occupied at the time of the decision "psychological parent" status with respect to Cameron. A psychological parent, as we stated in Carter v. Brodrick, is:
one who, on a day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for an adult. This adult becomes an essential focus of the child's life, for he is not only the source of the fulfillment of the child's physical needs, but also the source of his emotional and psychological needs.... The wanted child is one who is loved, valued, appreciated, and viewed as an essential person by the adult who cares for him.
.... This relationship may exist between a child and any adult; it depends not upon the category into which the adult fallsbiological, adoptive, foster, or common-lawbut upon the quality and mutuality of the interaction.[5]
One fundamental problem with the McTaggarts' argument is that the court did not find the McTaggarts to be psychological parents. They acknowledge that this status is more demanding than the "significant connection" status that a third party must have in order to seek custody. Since the McTaggarts were not found to have psychological parent status, they could not take advantage of any unique rules that might be used in custody cases between psychological parents and biological parents.
Further, there are no such rules, or at least none pertinent to this case. In J.W. v. R.J. we rejected the proposition that a psychological parent will have the benefit of standards applicable to biological parents in custody disputes with a biological parent.[6] Thus even if the McTaggarts were psychological parents, they still would be subject to the rules governing third parties who are seeking custody in cases involving parents.
The parties agree on the substance of what must be proved for a non-parent to prevail over a parent in a child custody case. The seminal case is Hickey v. Bell.[7] There we approved of *1083 the majority view which is that as between parents and grandparents adversely claiming custody of a child, either parent is entitled to a preference over the grandparents, unless it is clearly shown that the parent is unfit for the trust, or that the welfare of the child requires it to be in the custody of the grandparents.[8]
Hickey was followed by Wilson v. Mitchell,[9] which reiterated these requirements. In Turner v. Pannick[10] the question was whether the "welfare of the child" requirement discussed in Hickey and Wilson could be satisfied if the non-parent showed that the child's best interests would be served by awarding custody to the non-parent, or whether the non-parent must prove "that it clearly would be detrimental to the child to permit the parent to have custody."[11]Turner held that the welfare of the child test could not be satisfied by a best interests showing and that what was required was a showing that parental custody would clearly be detrimental to the child.[12]
The parties also agree that the non-parent has the burden of proving either that the parent is unfit or that the welfare of the child (as explained in Turner) requires the child to be in the custody of the non-parent. But, as noted, they disagree as to the standard of proof that the non-parent must satisfy in meeting these substantive requirements. Their disagreement is understandable because our case law is inconsistent.
In Hickey the court adopted what was stated to be the majority view that parents are entitled to preferences over grandparents unless it is "clearly shown" that the parent is unfit or that the welfare of the child requires the child to be in the custody of the grandparents.[13] The words "clearly shown" reflect a standard of proof higher than the preponderance standard.[14] In Wilson, also a case involving a custody contest between grandparents and a parent, the court repeated the "clearly shown" formulation of Hickey.[15]
In Turner the court twice quoted the "clearly shown" formulation from Hickey and Wilson.[16] In discussing what must be proved as to the substantive welfare of the child requirement, the court held that "the non-parent must show that it clearly would be detrimental to the child to permit the parent to have custody."[17] Thus Turner contains language that it must be "clearly shown" that the welfare of the child requires custody to be in a third party and language that the welfare of the child requirement means that clear detriment to the child must be proved. The two formulations are not inconsistent for the former goes to the standard of proof and the latter goes to the substance of what must be proved. Substituting "clear detriment" for the welfare of the child requirement, the Hickey/Turner formulation would read that a parent is entitled to custody unless a third party clearly shows that the parent is unfit or that the child would suffer clear detriment if placed in the custody of the parent.
In Britt v. Britt the preponderance of the evidence standard in non-parent/parent custody disputes was first announced.[18] In Britt the trial court awarded custody to the grandparents. The trial court used the proper substantive standard and concluded that neither parent was fit to have custody. But *1084 because the child had earlier been awarded to the grandparents by agreement, and it was disputed as to whether the award was meant to be temporary or permanent, the trial court announced that neither party bore a burden of proof concerning the facts that must be established. On appeal, the court treated the award as temporary and disagreed with the trial court's view that neither party should have a burden of proof. The court stated that "Turner makes clear that in such cases the non-parent must overcome by a preponderance of the evidence the preference for parental custody."[19] The court also concluded that the trial court's finding that the mother was unfit was clearly erroneous.[20]
Britt's conclusion that the non-parent has the burden of making the substantive showing required by Turnerand Wilson and Hickeyis correct, for Turner stated that "in order to satisfy the `welfare of the child' requirement, the non-parent must show that it clearly would be detrimental to the child to permit the parent to have custody."[21] But the statement by the Britt court that Turner makes clear that the applicable standard of proof that must be met is the preponderance of the evidence standard is puzzling. There is no mention in Turner of the preponderance of the evidence standard. The only reference to standards of proof in Turner are in the quotations from Hickey and Wilson, both of which refer to the requirement that it be "clearly shown that the parent is unfit ... or that the welfare of the child requires [third-party custody]."[22]
The statement in Britt that the standard of proof is by a preponderance of the evidence has been repeated in a number of opinions of this court. These include Buness v. Gillen,[23]J.W. v. R.J.,[24] and Todd v. Todd.[25]
Despite Britt and its progeny, other cases after Britt continued to follow the Hickey/Turner formulation. In Carter v. Novotny the court stated that "[a] parent is also entitled to a custodial preference over non-parents, unless there is clear evidence that the parent is either (1) unfit or (2) the welfare of the child requires that the child be placed in the custody of a non-parent."[26] The Carter opinion went on to state that the welfare of the child requirement is satisfied by "a finding that parental custody is clearly detrimental to a child."[27] The Carter opinion cited Britt for the proposition that "the burden of proving detriment is on the non-parent" but did not repeat Britt's statement concerning the preponderance of the evidence standard of proof.[28]
In C.R.B. v. C.C. and B.C. the court discussed the parental preference doctrine, noting that it "is a vital safeguard against enabling non-parents to convince courts to remove children improperly from their parents."[29] The court stated:
We apply a parental preference to avoid "the danger of giving courts the power to award custody ... to [nonparents] solely on the grounds of best interests. If [that] is the only criterion, then a judge may take children from their parents because the judge personally [disapproves of] the parents' limited means." Turner, 540 P.2d at 1055; see also id. at 1054-55 (citing chilling example of Painter v. Bannister, 258 Iowa 1390, 140 N.W.2d 152, 154 (1966) (indicating disapproval of father's bohemian lifestyle, despite evidence of his care and concern for child, and giving grandparents custody on ground that their home provided "a stable, conventional, middle-class, middlewest background")). Justice Dimond noted in Turner that to let a court take a child from its parents merely because *1085 a nonparent can better serve the court's idea of the child's interests is "a step toward a totalitarian government." Id. at 1055-56 (Dimond, J., concurring).[30]
The court then addressed not only what must be proved substantively to overcome the parental preference but the standard by which it must be proved:
The parental preference avoids this danger by requiring a nonparent not merely to prove by a preponderance of the evidence that the nonparent can better serve a child's interests, but to prove by "clear evidence" that a parent is unfit or that his or her custody is clearly detrimental. Carter, 779 P.2d at 1197. We apply this rule, like most courts, despite an inevitable sacrifice of children's interests in cases where a nonparent can better serve those interests, but a parent's custody is not "clearly detrimental."[31]
C.R.B. is important for several reasons. It is our only case that has alluded to both a preponderance of the evidence standard of proof and a higher"clear evidence"standard. It is also evident that the C.R.B. court made a deliberate decision that the heightened standard was to be preferred. Further, the C.R.B. opinion gave reasons for this decisionin order to reduce the danger that non-parents would be preferred to parents merely because the parents have limited means or follow an unconventional lifestyle.
Consistent with C.R.B. we believe that a heightened standard of proof is appropriate in initial custody contests between parents and non-parents.[32] We conclude that the heightened standard should be a clear and convincing evidence standard. We choose this standard rather than the "clear evidence" standard of C.R.B. and Carter, or the "clear showing" standard of Hickey, Wilson, and Turner, not because it is necessarily substantively different, but because it is the customary formulation of the intermediate standard that lies between the preponderance standard and proof beyond a reasonable doubt.[33] We thus hold that in order to overcome the parental preference a non-parent must show by clear and convincing evidence that the parent is unfit or that the welfare of the child requires the child to be in the custody of the non-parent.[34] One element of the welfare of the child requirement is that the non-parent must show that the child would suffer clear detriment if placed in the custody of the parent.
We reach this conclusion for a number of reasons. It is faithful to the line of cases that began with Hickey and is most recently reflected by C.R.B. C.R.B. reflects a deliberate choice supported by reasons and an accurate reading of the cases on which it relies. Britt, on the other hand, appears to be based on a mistaken interpretation of Turner and gives no reasons for its selection of a preponderance standard. Further, both the majority opinion and Justice Dimond's concurring opinion in Turner warn against use of a substantive standard under which a judge might remove children from their parents because of the judge's personal disagreement with the parents' lifestyle or because the parents have limited means. In Turner Justices Dimond and Rabinowitz filed separate concurring opinions in which they questioned whether there was a substantive difference between choosing third-party custody because the best interests of a child were better served by such custody, and choosing *1086 third-party custody because it would be clearly detrimental to the child not be placed with the third party. Speaking of the majority opinion, Justice Dimond observed that "this seems to create a dichotomy between `welfare' and `best interests' which is not easy to comprehend."[35] If this is true, it seems especially desirable to impose a heightened standard of proof in order to reduce the risk of too readily overcoming the parental preference.[36]
The result we reach is consistent with the results in many other jurisdictions.[37] Either by statute or by decision law, numerous jurisdictions impose a standard of proof higher than a preponderance of the evidence in custody contests between a parent and a non-parent. There is also contrary authority.[38]

3. Application of the standard of proof
Because the trial court applied a preponderance of the evidence standard rather than a clear and convincing evidence standard to its determination of detriment, a *1087 remand is necessary so the court can consider whether the higher standard has been met. The trial court also made findings that can be read to be findings that Lisa is "unfit for the trust," satisfying the first element of the Hickey test. But the court did not specify what standard of proof it used in making these findings. On remand, if the court intends that these findings should be viewed as satisfying the unfitness element of the Hickey test, it should consider whether they can be made under the clear and convincing standard. The court also declined to find that it would be clearly detrimental, as distinct from detrimental, for Cameron to be placed in Lisa's home. As the substantive standard required is clear detriment, the court should consider whether clear detriment has been proved.

4. Factual finding of detriment
Lisa challenges the trial court's finding that it would be detrimental for Cameron to be placed with Lisa, and a number of subsidiary findings. Findings of fact may only be disturbed on appeal if they are clearly erroneous.[39] We have reviewed the evidence and conclude that there is sufficient evidentiary support for each of the court's findings. We note, however, that the trial court emphasized Cameron's need for stability. It seems possible that some of the instability that Cameron experienced may be ascribed to the split physical custody arrangement between Lisa and Nathan. On remand, when deciding whether the heightened standard of proof has been satisfied and whether Cameron would suffer clear detriment if he were placed with Lisa, the court should consider whether the instability that Cameron has experienced was due to the split custody arrangement and might be eliminated by primary custody with Lisa.

B. Visitation with Shawn
Lisa argues that awarding the McTaggarts visitation rights with Shawn violates her constitutional right as a parent to control the upbringing of her child. She contends that AS 25.20.060(a) is unconstitutional. Alaska Statute 25.20.060(a) permits a court in a custody dispute between parents to "provide for visitation by a grandparent or other person if that is in the best interests of the child."[40]
Lisa bases her argument primarily on the 2000 decision of the United States Supreme Court in Troxel v. Granville.[41] In Troxel the Supreme Court reviewed a decision by the Washington Supreme Court that struck down a non-parental visitation statute.[42] The statute in question permitted "any person" to petition a superior court for visitation rights "at any time" and authorized the court to grant visitation rights whenever "visitation serves the best interest of the child."[43] The Washington Supreme Court held the statute to be unconstitutional on its face because it believed that the federal constitution permits a state to interfere with the right of parents to rear their children only when necessary to prevent harm or potential harm to children.[44] Further, the Washington court concluded that the statute was overbroad in permitting "any person" to petition for visitation "at any *1088 time."[45] The intermediate Washington Court of Appeals had construed the statute to apply only when a custody action is already pending, but the Washington Supreme Court rejected this interpretation.[46] The Washington Supreme Court also declined to impose any other narrowing construction on the statute pertaining either to standing or a heightened standard of proof.[47]
The United States Supreme Court affirmed the judgment of the Washington Supreme Court, but did so on different grounds than those relied on by the Washington court. There was no majority opinion. The lead opinion authored by Justice O'Connor, and joined in by three other justices, held that the statute as applied to Granvillethe motherwas unconstitutional.[48] A "combination of several factors" led the plurality to reach this conclusion.[49] The factors mentioned are first that Granville was not found to be an unfit parent.[50] Second, the Washington Superior Court did not "accord at least some special weight" to the presumption that a fit parent will act in the best interest of her child.[51] Third, there was no indication that Granville had ever sought to completely cut off visitation with the grandparents.[52] (She had agreed to one visit per month and special holidays whereas the grandparents sought two weekends of overnight visitation per month and two months of summer visitation.)[53] The lead opinion also relied on what it described as the "sweeping breadth of the statute,"[54] noting:
The Washington Supreme Court had the opportunity to give [the statute] a narrower reading, but it declined to do so. See, e.g., [In re Custody of Smith, 137 Wash.2d 1] 969 P.2d [21] at 23 [1998] ("[The statute] allow[s] any person, at any time, to petition for visitation without regard to relationship to the child, without regard to changed circumstances, and without regard to harm."); 969 P.2d at 30 ("[The statute] allow[s] `any person' to petition for forced visitation of a child at `any time' with the only requirement being that the visitation serve the best interest of the child.").[55]
Having relied on these grounds to hold the Washington statute unconstitutional as applied to the case, the plurality declined to consider the main constitutional question decided by the Washington Supreme Court "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation."[56]
Justice Souter concurred.[57] He believed that the Washington Supreme Court decision that the statute was unconstitutional on its face should be affirmed.[58] He noted that the Washington court had made this decision based on two independent grounds: first that the statute did not require harm to the child to justify visitation, and second that the statute authorized any person at any time to petition for and receive visitation rights under the best interests standard.[59] Justice Souter saw no error as to the second reason, and also therefore found no need to decide whether harm is required, or to consider the precise scope of a parent's right or its necessary *1089 protections.[60] Justice Souter read the Washington Supreme Court decision as interpreting the statute not to require the petitioner "to establish that he or she has a substantial relationship with the child."[61] He stated: "It would be anomalous, then, to subject a parent to any individual judge's choice of a child's associates from out of the general population...."[62]
Justice Stevens dissented.[63] In his view the statute was "not made facially invalid either because it may be invoked by too many hypothetical plaintiffs, or because it leaves open the possibility that someone may be permitted to sustain a relationship with a child without having to prove that serious harm to the child would otherwise result."[64] Similarly, Justice Kennedy dissented on the basis that the Washington court's harm ruling was erroneous.[65] Justice Kennedy surveyed the statutes of all fifty states and found that in all states but one the best interests test for third-party visitation is used.[66] He concluded that in view of the "almost universal adoption of the best interests standard for visitation disputes, I would be hard pressed to conclude that the right to be free of such review in all cases is itself `implicit in the concept of ordered liberty.'"[67] Justices Thomas and Scalia also authored separate opinions.[68]
In our opinion, the Troxel opinions, viewed collectively, do not indicate that AS 25.20.060(a) is facially unconstitutional. The statute, as we construe it, does not permit any person at any time to seek visitation rights. Visitation rights can only be sought in a pending case concerning child custody. Further, although the statute permits a court to provide for visitation based on the best interests of the child "by a grandparent or other person" we construe the latter phrase to be limited to third parties who have a significant connection to the child.
These two differences serve to distinguish our statute from "the sweeping breadth" of the Washington statute that was, in part, the basis for the plurality's conclusion in Troxel that the Washington statute was unconstitutional, and was the basis for Justice Souter's concurrence.
We also give a narrowing construction to AS 25.20.060 so that it need not be unconstitutional as applied. Justice O'Connor's lead opinion states that special weight must be given to a fit parent's determination as to the desirability of visitation with third parties.[69] We believe that this can be accomplished by imposing on the third person the burden of proving that visitation by the third person is in the best interests of the child and by requiring that this be established by clear and convincing evidence. This would provide effective protection for a parent's choice, except where the choice is plainly contrary to a child's best interests.
There are also special circumstances in this case that lead us to conclude that visitation with the McTaggarts can be constitutionally required. The McTaggarts' status as custodians of Shawn's half-brother Cameron is one such circumstance. The boys are only a year separated in age. The trial court designed Shawn's visitation so that he would be with the McTaggarts at times that Cameron was also there because the court found *1090 that it is in Shawn's best interest that he have as much time with Cameron as possible. This is a reasonable and legitimate objective.
Second, the court may have found that Lisa is unfit to make decisions concerning Shawn's visitation.[70] As in the case of custody, we believe that a finding of parental unfitness to make a visitation decision should be made using a clear and convincing evidence standard in order to reduce the possibility of an erroneous interference with parental prerogatives.
We do not believe that AS 25.20.060(a), as we have interpreted it in this opinion, is unconstitutional on its face or that its application in this case will necessarily yield an unconstitutional result. On remand the trial court should determine by clear and convincing evidence whether it is in the best interests of Shawn that visitation with the McTaggarts be provided. Alternatively, if the court intends to find that Lisa is unfit to make the visitation decision for Shawn, the court should address whether this finding can be made under a clear and convincing evidence standard.

C. Child Support
The court ordered Lisa to pay the McTaggarts fifty dollars a month for child support for Cameron. The court found that Lisa's income fell below federal income poverty guidelines and imposed the fifty dollar minimum sum called for by Civil Rule 90.3(c)(1)(B). The court entered the order on March 6, 2002. On May 17, 2002, Lisa sought relief from the order, purportedly under Civil Rule 60(b)(1) (mistakes of law) and (5) (no longer equitable that the judgment should have prospective application).
Lisa contended that the court had mistakenly applied Civil Rule 90.3(a), pertaining to primary custody. She argued that the court should have applied 90.3(b), relating to shared custody. She argued that shared custody was appropriate because she had visitation with Cameron about thirty-three percent of the time, thus crossing the thirty-three percent dividing line between primary and shared custody set out in Civil Rule 90.3(f)(1). Child support under Civil Rule 90.3(b) relating to shared custody can mean that the parent with whom the child lives most of the time is required to pay child support to the other parent if the discrepancy in income between the parents is sufficiently large. Lisa has offered no calculations, but given her low income it is possible that if her argument is correct the McTaggarts would owe her child support.
But her argument is not correct. Civil Rule 90.3(b) only relates to cases in which parents are awarded shared physical custody. Third-party custody is provided for under Civil Rule 90.3(i). That rule, in turn relies on the percentages set out in subparagraph (a)(2). It does not speak to situations that would be shared custody, if between parents. Some sensible adjustment may be called for in such circumstances. But whatever the adjustment might be, it should not include use of the formula in Civil Rule 90.3(b). The approach Civil Rule 90.3 follows is an intact family model, "based on economic analyses which show the proportion of income parents devote to their children in intact families is relatively constant across income levels up to a certain upper limit."[71] Third-party custodians were never part of the intact family and thus cannot be treated as parents.
As Lisa argues only that Civil Rule 90.3(b) should have been used, and the award is minimal, the award is affirmed.

IV. CONCLUSION[72]
For the reasons stated the award of custody of Cameron is vacated; the award of *1091 visitation relating to Shawn is vacated; the award of child support is affirmed; and the case is remanded for the following purposes.
Concerning custody, on remand the court should determine whether the substantive standards for third-party custodyparental unfitness or clear detrimenthave been satisfied by clear and convincing evidence. If the court decides that neither substantive standard has been met by the clear and convincing standard based on the evidence already presented, the court should hold an evidentiary hearing updating the facts concerning Cameron's custody and make an appropriate custody order in light of all the evidence.
Concerning visitation, on remand the court should determine whether Lisa's parental preference as to Shawn's visitation has been overcome by clear and convincing evidence that it is in Shawn's best interests that he visit with the McTaggarts. Alternatively, the court should decide by clear and convincing evidence whether Lisa is unfit to make visitation decisions concerning Shawn. If the court decides that its order concerning visitation cannot be sustained on the basis of the present evidence, the court may hold an updated evidentiary hearing and make an appropriate order concerning visitation in light of all the evidence.
Pending the superior court's determinations on remand, the status quo concerning custody and visitation should not be disturbed.
AFFIRMED in part, VACATED in part, and REMANDED for further proceedings.
EASTAUGH, Justice, with whom BRYNER, Justice, joins, concurring.
FABE, Chief Justice, with whom CARPENETI, Justice, joins, dissenting.
EASTAUGH, Justice, with whom BRYNER, Justice, joins, concurring.
I agree fully with the court's opinion, but write separately to briefly address several contentions advanced by the dissenting opinion.
The dissenting opinion asserts that the court's opinion jeopardizes the doctrine of stare decisis. Dissent at 1094. But that doctrine presupposes that there is controlling precedent.[1] Careful readers of our opinions discussing or referring to the proof standard for non-parental custody would have a hard time reconciling them, as the court's opinion demonstrates today. Simply counting the opinions discussing the standard of proof and comparing their chronology does not reveal clearly what standard is to be applied in Alaska when considering the effect of the parental preference on an award of non-parental custody. Certainly some of our decisions have approvingly discussed the preponderance standard.[2] But in doing so, they did not disapprove (or even discuss) any other standard. On the other hand, we have also recently expressly rejected the preponderance standard on the theory the parental preference requires "clear evidence" of parental unfitness.[3] Thus, in C.R.B. v. C.C., we *1092 explained that "[t]he parental preference avoids this danger by requiring a nonparent not merely to prove by a preponderance of the evidence that the nonparent can better serve a child's interests, but to prove by `clear evidence' that a parent is unfit or that his or her custody is clearly detrimental."[4] We often use "clear evidence" to refer to the quality of evidence needed to satisfy the clear and convincing standard of proof.[5]
Moreover, in at least some of our opinions mentioning the proof standard, discussion of the standard appears to have been unnecessary to the appellate outcome.[6] And my review of the appellate briefs filed in most of those cases reveals that rarely have the parties actually briefed the issue.[7] I suspect that our inconsistency in discussing the proof standard originates in past inconsistency in distinguishing between the substantive requirements and the proof standard for awarding non-parental custody.
I conclude that our discussion of the applicable proof standard has not been consistent, and that it does not offend the doctrine of stare decisis to make it clear what standard should apply in Alaska.
The dissenting opinion expresses concern about the effect the clear and convincing standard will have on children's safety. Dissent at 1095-97. I doubt that this standard will, as a practical matter, affect the outcome in any case in which a child's safety is really at stake. I think that parental unfitness that endangers a child and that satisfies Turner's substantive standard is very likely to be reflected in credible evidentiary sources, such as third-party observers, police, health care providers, or social workers. As for cases arising from reports attributable to the child, it seems highly probable that the non-parental litigant, or a guardian ad litem or custody investigator, will be able to marshal evidence corroborating a plausible report by the child.
*1093 The dissenting opinion also correctly observes that the award of custody is not inherently as permanent as the termination of parental rights. Dissent at 1097. It therefore contends that the less rigorous proof standard should apply to custody awards. But in reality, the kind of parental unfitness that satisfies Turner and justifies non-parental placement is not easily (and quickly) remedied. This means that even though an award of non-parental custody is not permanentbecause improvement in the parent's fitness may be a material change of circumstancesits duration is likely to be long relative to that period in a child's life during which a parent can affect the child's development. Given the child's interest in stability, the passage of time does not work in the parent's favor. Non-parental custody therefore squarely implicates important parental rights. They, in turn, warrant the clear and convincing standard.
FABE, Chief Justice, with whom CARPENETI, Justice, joins, dissenting.
Today's decision marks a major departure from our precedent and policy in resolving child custody disputes between parents and non-parents. Our previous child custody decisions have attempted to strike a balance between protecting children and preserving the autonomy of the family. The court's decision to adopt a higher burden of proof in non-parent custody cases, requiring that clear detriment to the child be shown by clear and convincing evidence before parental preference may be disregarded, is unfaithful to our case law and undermines the important policy of protecting children.
I. Adoption of the "Clear and Convincing" Standard Is Not Faithful to Our Legal Precedent.
The court's review of the legal precedent on the burden of proof in child custody disputes between parents and non-parents notably ignores our case law expressly adopting the preponderance of the evidence as the correct standard for proving clear detriment. In Turner v. Pannick, we first determined the appropriate substantive standard for deciding custody disputes between a parent and a non-parent: the parental preference may only be overcome when it would be clearly detrimental to the child.[1] Our subsequent cases unequivocally adopted and applied the preponderance burden of proof for showing that custody with the parent would be clearly detrimental to the child.[2] None of our decisions in this area has applied the clear and convincing standard.[3]
In Britt v. Britt, we announced that the non-parent must prove, "by a preponderance of the evidence," that parental custody would be clearly detrimental to the child.[4] And twelve years later, Justice Rabinowitz's opinion in Buness v. Gillen relied on Britt for the proposition that "[t]he burden of showing detriment to the child, by a preponderance of the evidence, is on the non-parent."[5]Britt's evidentiary standard was again affirmed in Justice Eastaugh's opinion on behalf of the court in J.W. v. R.J., which noted that "the nonparent has the burden of proving the detriment by a preponderance of the evidence."[6]
And, while the court relies heavily on C.R.B. v. C.C.[7] to justify adopting the clear *1094 and convincing standard,[8]C.R.B. made no attempt to distinguish Britt, Buness, and J.W., the cases expressly stating the preponderance of the evidence standard. Instead, the C.R.B. court relied on dicta from Carter that noted that a "parent is also entitled to a custodial preference over non-parents, unless there is clear evidence" that the parent is either unfit or the welfare of the child requires that the child be placed in the custody of a non-parent.[9] But it is evident that the Carter court did not intend to change the previously established preponderance standard, for just one month after Carter, Buness reaffirmed the use of the preponderance of the evidence standard.[10] Indeed, C.R.B.'s reasoning seems to go more to the substantive standard of balancing a child's and parent's interests, recognizing the "inevitable sacrifice of children's interests in cases where a nonparent can better serve those interests, but a parent's custody is not `clearly detrimental.'"[11]
Less than two years after C.R.B., we decided Todd v. Todd.[12]Todd did not refer to any "deliberate decision"[13] in C.R.B. to adopt a higher standard and instead cited Britt for our rule that "the burden is on the non-parent to prove, by a preponderance of the evidence, that parental custody would be `clearly detrimental.'"[14] In Todd, we did more than repeat the Britt standard; we compared the best interest standard applied to custody cases between parents with the clearly detrimental standard for custody cases between a parent and a non-parent.[15] And we concluded that even if the non-parent has been the primary caregiver, the non-parent still must prove, by a preponderance of the evidence, that parental custody would be clearly detrimental.[16]
In sum, we have repeatedly announced and applied the preponderance of the evidence standard as the proper burden of proof in third-party custody cases.[17] The court's claim that the adoption of the clear and convincing standard is "faithful to [a] line of cases"[18] selectively ignores our explicit adoption of the preponderance standard.[19]
In light of our prior decisions confirming the preponderance of the evidence test as the correct evidentiary standard in custody disputes between a parent and a non-parent, the court jeopardizes the doctrine of stare decisis by its decision today. Although the court does not admit it, this decision essentially overrules our cases adopting and applying the preponderance of the evidence standard. It is our policy to "balance[ ] our community's competing interests in the stability of legal norms and the need to adapt those norms to society's changing demands."[20] We will only overrule a prior decision when "clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent."[21] The court's decision does not explain why the preponderance of the evidence *1095 standard is clearly erroneous or unsound, nor does it describe the good attained by the new rule. Instead, the court rejects precedent, undermining the stability that stare decisis aims to provide.

II. Substantive and Evidentiary Standards Matter.
The court asserts that a higher burden of proof is necessary because the heightened substantive standard of clear detriment is inadequate protection for parents.[22] To support this proposition, the court cites the concurring opinions from Turner that questioned whether there is a difference between a best interests and a clearly detrimental analysis.[23] But the court cites no case since Turner to suggest that courts have been unwilling or unable to use the clearly detrimental standard. In fact, in Kinnard v. Kinnard, we acknowledged that "[t]he trial court explicitly recognized the distinction between the `best interests' and `detriment' standards."[24] While the heightened substantive standard of clear detriment is desirable, the court's adoption of a high evidentiary standard is unnecessary and problematic.
The burden of proof has a significant impact on the outcome of cases. Decision-makers are keenly aware of the burden of proof and apply it even in those cases where the result of the proper application may yield a result that they might not have otherwise chosen. For example, in State, Department of Health & Social Services, Division of Family & Youth Services v. M.L.L., we upheld the trial court's rejection of the state's termination petition because the court "could not find beyond a reasonable doubt that returning the children to the mother would likely result in serious emotional or physical damage."[25] Although the trial court determined that termination of the mother's rights and placement with the foster mother would be in the children's best interest, it denied the state's petition because of the failure of proof on the serious emotional or physical damage issue.[26]
Carter v. Novotny confirms that trial courts are conscientious about the evidentiary burden in child custody cases as well. In Carter, the trial court applied the clearly detrimental substantive standard when it initially denied a maternal aunt's motion for custody of a fourth child even though the first three children, two of whom had reached majority, had all chosen to live with the aunt rather than their father.[27] Only following receipt of a psychological evaluation, two additional reports, and testimony did the court shift physical custody to the aunt about a year later.[28] These cases show quite clearly that, despite the concurrence's hopeful hypothesis,[29] different burdens of proof can and do lead to different results in close cases.
And it is not at all surprising that they do. The standard of proof is meant to allocate the risk of an erroneous judgment between the parties. As the United States Supreme Court has noted, the burden of proof reflects society's judgment about which party should bear the risk of an erroneous factual determination: "The function of a standard of proof ... is to `instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'"[30] Inevitably, in close cases, a higher standard of proof will place the risk of erroneous factfinding on the child. As M.L.L. and Carter v. Novotny show, trial judges are conscientious and careful about following the prescribed burden of proof, and *1096 cases of parental custody present no exception to this rule.[31]
III. Our Policy Has Been and Should Remain To Protect Children.
The protection of the rights of children has developed profoundly in recent years.[32] Although safeguarding parents' rights is an important policy, protecting children is paramount.[33] And both policy goals are served by a heightened substantive standard, such as serious and substantial detriment to the child, paired with the standard that this harm must be proved only by a preponderance of the evidence.[34] The high substantive standard ensures that a child will not be placed with a non-parent simply because that person provides a more comfortable lifestyle in the judge's eyes. Rather, in order to overcome the parental preference, a non-parent should be required to show that the child will be subject to a serious and substantial harm if left with the parent. In Shurupoff v. Vockroth, Maryland's highest court recently addressed the question of what burden of proof would best effectuate sound policy and adopted the preponderance of the evidence standard,[35] recognizing that "[m]ost States ... have not defined any particular standard of proof but have sought to protect parental rights through the heavy substantive burden placed on the third party."[36]
The court's error in adopting the clear and convincing standard is brought into stark relief when reviewed in the context of the statutory scheme for child protection cases. In the adjudication of child in need of aid (CINA) cases, the state need only prove by a preponderance of the evidence that a child is in need of aid.[37] The statute lists a number of circumstances under which a child will be found to be a child in need of aid, including when a parent's conduct places the child at risk of physical or mental injury.[38] The mental injury grounds specifically contemplate the parent's "pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior"[39] and the parent's neglect of the child.[40] As in the child in need of aid cases, the purpose of Turner's clear detriment standard is to protect children who would be harmed if left in a parent's custody. The parental conduct listed in the CINA statute, which need only be proved by a preponderance of the evidence, is comparable to the serious and substantial detriment evaluated in custody disputes between parents and non-parents. The children suffering in these severe circumstances should be afforded the same protection regardless of whether the evidence is presented by the state or a concerned non-parent. In fact, non-parent involvement may be preferable to the state's because if the court finds that parental custody is clearly detrimental, there is an available and loving alternative custodian. This suggests that a non-parent seeking custody should face the same burden of proof required of the state.
A preponderance of the evidence finding that a child is a child in need of aid results in custody with the state and state placement of *1097 the child for up to two years.[41] A custody award to a non-parent similarly is not permanent; it is modifiable if there is a substantial change in circumstances.[42] And as we concluded in Nichols v. Mandelin, after custody has been awarded to one parent, the other, non-custodial parent can satisfy the threshold substantial change of circumstances requirement by demonstrating a positive change in his or her personal circumstances.[43] In Nichols, the mother's ability to demonstrate that she had matured, held a job for an extended period of time, and controlled her former drinking problem amounted to a substantial change in circumstances.[44] The same standard would apply if a parent sought to modify a custody award to a non-parent; the parent could show that he or she had changed circumstances so that parental custody will no longer be clearly detrimental to the child. The presumption that placement with the parent is in the child's best interests would then satisfy the second requirement of modification: that the modification is in the child's best interests.[45] Thus, the ability to modify a custody award provides additional protection to a parent if custody is awarded to a non-parent.
It is true that termination of parental rights must be demonstrated by clear and convincing evidence.[46] But this higher standard of proof is necessary because of the permanency at stake in a termination proceeding. Maryland's highest court reasoned in Shurupoff that a higher standard of proof is justified where termination of parental rights is contemplated because of the significant differences between the state seeking to permanently and irrevocably terminate all parental rights and "a dispute between two private individuals over who should have custody of the child during his or her minority, subject to modification by the court upon a proper showing of changed circumstances."[47] The Shurupoff court also recognized the distinct concepts of custody involved; in a custody dispute between private parties, the court's award does not result in the non-custodial parent losing the right to visit the child, to have the child at convenient times, to communicate with the child, to participate in the child's activities, or to influence the child's development.[48] The clear and convincing burden of proof contemplates the severity of parental rights termination while the preponderance burden accommodates the immediate protection of children from seriously harmful circumstances.
The court's formulation also ignores the reality that it may be difficult for the non-parent to show by clear and convincing evidence that a parent's custody will be clearly detrimental to the child. A child's report of a parent's destructive conduct is often the primary source of evidence. Even if it is not debatable that the parent's actions are harmful to the child, the lack of corroboration particularly in light of a parent's denialmay mean that the child's report, although providing a preponderance of the evidence, will fail to satisfy the clear and convincing standard. It is undisputed that emotional abuse, such as screamed insults, derision, and exposure to damaging situations can result in mental harm that could constitute clear detriment, but if the child reports the emotional abuse and the parent denies it, there may be insufficient corroborating evidence of the abuse to meet the burden set out by the court. For example, in Martin N. v. State, Department of Health & Social Services, Division of Family & Youth Services, a CINA case, we recognized that a child's continued exposure to domestic violence "terrorizes" the child and is enough to cause mental harm, rejecting the father's claim that CINA status is inappropriate when the child was not physically harmed.[49] But unlike physical abuse *1098 where bruises, broken bones, and scars may provide the corroboration required for clear and convincing evidence, mental abuse like the "terrorizing" in Martin may be invisible, making a child's report the primary source of evidence. As a result, the higher standard may not be met and the child will remain with the abusive parent. At the very least, adoption of this higher burden of proof will undoubtedly result in more expert witnesses being called at custody trials, making custody disputes even more expensive and time consuming to resolve.
Application of the preponderance standard would not require courts to ignore that an optimal upbringing includes an intimate, consistent relationship with a parent or parents that is insulated from interference by third parties.[50] Parents do make "uniquely valuable contributions" to a child's development.[51] Interference in the parent-child relationship must be limited to those occasions when non-intervention would allow a greater harm to the child than intervention would cause.[52] While the American Law Institute's Principles of the Law of Family Dissolution emphasizes that a court should generally place a child with his or her parent, the ALI recognizes that there is an exception when parental custody "would be harmful to the child."[53] The ALI commentary acknowledges that non-parent custody should be an "exception" that "provides a safety net for extreme circumstances, to allow a court to protect a child when the result of applying the rule [preferring parental custody] would likely pose significant risks to the welfare of the child."[54] Although ALI reserves non-parent custody for "extreme circumstances"thus adopting a high substantive standardits use of the phrase "likely pose" indicates approval of the preponderance standard of proof, rather than clear and convincing evidence. Intervention is necessary when a child is subjected to detrimental conduct and the excessive evidentiary burden that the court imposes will continue to place the child at risk.

IV. Conclusion
In the present case, the trial court found that eight-year-old Cameron is at high risk as an emotionally disturbed child and that neither Cameron's mother nor his father can meet his needs. Cameron has a generalized anxiety disorder and is severely emotionally disturbed. His father does not know how to parent and he reportedly taped Cameron's mouth shut as punishment. The custody investigator described Cameron's mother as someone who cannot take care of meeting her own needs, making it unlikely that she can meet Cameron's needs. Cameron's mother has never, in eight years, taken Cameron to see a dentist despite knowing that Cameron has a decayed tooth. And when Cameron's mother learned that he was sneaking food when he was hungry, after she had forbidden him snacks, she punished him by preventing his attendance at a school field trip.
The court found that Cameron's mother uses him as a "weapon of her anger and spite" toward Cameron's father. And the custody investigator described Cameron as a "rope in a tug of war between parents or families." There was testimony about Cameron's mother's vindictive attitude toward his paternal grandparents, the McTaggarts, including returning gifts given to Shawn and Cameron and throwing holiday cards in the mud, placing Cameron in a "push, pull situation" where "he's going to explode." The superior court found that Cameron's mother is "unable to nurture and care for him." In the second and most recent custody report, after interviewing the children, parents, grandparents, doctors, teachers, and counselors, the investigator recommended that the *1099 court award custody of Cameron to the McTaggarts.
The superior court concluded that, based on a preponderance of the evidence, it would be detrimental to place Cameron with either of his parents. Certainly it is possible that in this case, where the court heard testimony from the custody investigator, Cameron's counselor, Cameron's parents and grandparents, as well as other family members, the court may find by clear and convincing evidence that placement with Cameron's parents will be clearly detrimental to Cameron. But on remand, I would require only a determination that the substantive standard of clear detriment was satisfied by a preponderance of the evidence. I therefore respectfully dissent.
NOTES
[1] 781 P.2d 985, 988 (Alaska 1989).
[2] We use these terms interchangeably. They are explained in Carter v. Brodrick, 644 P.2d 850, 852, 853 n. 2 (Alaska 1982), quoted in this opinion at pages 1082-83, infra.
[3] Lisa filed a document captioned "Partial Opposition to Motion to Intervene," but the supporting memorandum explained that Lisa "does not oppose the McTaggart[s'] intervention as parties in this case, but wishes to have the court fully informed concerning this aspect of the case."
[4] This court has held on several occasions that the "failure to raise the issue of capacity to sue results in a waiver of that defense." Moore v. State, Dep't of Natural Res., 992 P.2d 576, 577 n. 5 (Alaska 1999); see also Jackson v. Nangle, 677 P.2d 242, 250 n. 10 (Alaska 1984); King v. Petroleum Servs. Corp., 536 P.2d 116, 118 (Alaska 1975); Brown v. Music Inc., 359 P.2d 295, 300-01 (Alaska 1961) ("If a party wishes to raise an issue as to the capacity of a party to sue, he must do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge"; failure to raise the issue in the manner specified results in a waiver of the defense) (internal quotation omitted).
[5] 644 P.2d at 853 n. 2.
[6] 951 P.2d 1206, 1211 (Alaska 1998) ("The relationship between the stepparent and the child, no matter how close, does not justify application of the best interests standard....").
[7] 391 P.2d 447 (Alaska 1964).
[8] Id. at 448.
[9] 406 P.2d 4 (Alaska 1965).
[10] 540 P.2d 1051 (Alaska 1975).
[11] Id. at 1054.
[12] Id. at 1055.
[13] 391 P.2d at 448.
[14] Hickey cites to II Nelson, DIVORCE & ANNULMENTS § 15.16 (2d ed.1961). This section of the text in its specific discussion of grandparents as custodians uses the same "clearly shown" language as Hickey. In the preceding section of the text concerning the general subject of custody disputes between third parties and parents the text states that "it must be shown by convincing evidence that the parent is an unfit person...." Id. § 15.15, at 247 (emphasis added).
[15] Wilson, 406 P.2d at 7.
[16] Turner, 540 P.2d at 1054.
[17] Id.
[18] 567 P.2d 308 (Alaska 1977).
[19] Britt, 567 P.2d at 310.
[20] Id. at 311.
[21] Turner, 540 P.2d at 1054.
[22] Id. at 1053-54.
[23] 781 P.2d 985, 989 n. 7 (Alaska 1989).
[24] 951 P.2d 1206, 1210 n. 3 (Alaska 1998).
[25] 989 P.2d 141, 143 (Alaska 1999).
[26] 779 P.2d 1195, 1197 (Alaska 1989).
[27] Id. at 1197.
[28] Id.
[29] 959 P.2d 375, 380 (Alaska 1998) (emphasis omitted).
[30] Id. at 380.
[31] Id.
[32] When the non-parent has already been granted permanent custody, the parental preference drops out in subsequent modification proceedings. C.R.B., 959 P.2d at 380.
[33] See, e.g., Spenard Action Comm. v. Lot 3, Block 1, Evergreen Subdivision, 902 P.2d 766, 775-76 (Alaska 1995) (appropriate burden of proof in statutory nuisance abatement action is clear and convincing evidence, the standard "which lies between the civil standard of a preponderance of the evidence and the criminal standard of beyond a reasonable doubt"); In re C.L.T., 597 P.2d 518, 525 (Alaska 1979) ("the law has produced essentially three standards or levels of proof for different types of cases: proof by preponderance of the evidence; proof by clear and convincing evidence; and proof beyond a reasonable doubt"; adopting the "clear and convincing" standard for termination of parental rights due to unfitness) (citing Addington v. Texas, 441 U.S. 418, 423-25, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)).
[34] To the extent that they state that the appropriate standard is the preponderance standard, Britt, Buness, J.W., and Todd are disapproved of.
[35] Turner, 540 P.2d at 1055 (Dimond, J., concurring).
[36] When the state seeks to remove a child from the custody of a parent under our child in need of aid statutes, the standard of proof that the state must meet is the preponderance of the evidence standard. CINA Rule 15(c). We do not believe that CINA proceedings are closely analogous to third-party custody claims. CINA custody is reserved for a narrow, specifically defined set of extremely serious harms; in contrast, a third-party claimant can be granted custody for a broad range of undefined detriments. Further, CINA custody is granted for a limited duration; it terminates automatically after a set period unless the state takes the initiative of filing a petition to terminate parental rights. In the interim, it requires ongoing efforts by the state to reunite the family. In contrast, a private party order remains in effect indefinitelyunless modified; it can be modified only if the noncustodial parent takes the initiative by affirmatively alleging and proving changed circumstances; and it requires no intervening efforts to foster the parental relationship. As we noted in C.R.B., 959 P.2d at 379, while the CINA statutes "prioritize reunification" third-party custody cases focus on meeting children's needs of stability and permanence. Thus, while it is nominally open to change, a third-party custody order may well consign the parent and child to a functionally permanent severance of meaningful ties. Finally, it is always possible that inappropriate personal motives underlie a third-party claim of custody whereas such motives are unlikely to be a factor in CINA cases. These differences favor a stronger standard in third-party custody cases.
[37] In custody disputes between a parent and a third party, our research reveals that 14 states, including Arizona, California, Georgia, Idaho, Indiana, Kentucky, Michigan, Mississippi, North Carolina, Oklahoma, Rhode Island, Tennessee, Virginia, and West Virginia, impose a heightened burden of proof on a non-parent third party seeking custody of a child from a natural parent. See, e.g., Ariz.Rev.Stat. § 25-415(B)(1999) (clear and convincing evidence); Cal. Fam.Code § 3041 (West 1994) (clear and convincing evidence); Clark v. Wade, 273 Ga. 587, 544 S.E.2d 99 (2001) (clear and convincing evidence); Stockwell v. Stockwell, 116 Idaho 297, 775 P.2d 611, 613-14 (1989) ("clear, satisfactory, or convincing" evidence); In re Guardianship of B.H., 770 N.E.2d 283, 286 (Ind.2002) ("clear and cogent" evidence); Greathouse v. Shreve, 891 S.W.2d 387, 390 (Ky.1995) (clear and convincing evidence); Heltzel v. Heltzel, 248 Mich.App. 1, 638 N.W.2d 123 (2001) (clear and convincing evidence); Simpson v. Rast, 258 So.2d 233 (Miss. 1972) ("clear showing"); Adams v. Tessener, 354 N.C. 57, 550 S.E.2d 499 (2001) (clear and convincing evidence); McDonald v. Wrigley, 870 P.2d 777 (Okla.1994) (clear and conclusive evidence); Skeadas v. Sklaroff, 84 R.I. 206, 122 A.2d 444, 446 (1956) ("clear proof"); Toms v. Toms, 98 S.W.3d 140 (Tenn.2003) (clear and convincing evidence); Bailes v. Sours, 231 Va. 96, 340 S.E.2d 824 (1986) (clear and convincing evidence); Whiteman v. Robinson, 145 W.Va. 685, 116 S.E.2d 691, 693-94 (1960) ("cogent and convincing proof").
[38] Our research indicates that four states, Illinois, Maryland, Ohio, and Oregon, either use a preponderance of the evidence standard or have declined to require a heightened evidence burden on a non-parent party seeking custody from a parent. See, e.g., In re Marriage of Dafoe, 324 Ill.App.3d 254, 257 Ill.Dec. 761, 754 N.E.2d 419 (2001) (rejecting parent's contention that Troxel created a substantially heightened burden of proof for custody cases; non-parent seeking custody must show "good cause or reason" to overcome parental preference); Shurupoff v. Vockroth, 372 Md. 639, 814 A.2d 543 (2003) (presumption in favor of parent is overcome if the parent is unfit or exceptional circumstances exist that make custody with the parent detrimental to the best interests of the child; a clear and convincing standard is not constitutionally required); Reynolds v. Goll, 75 Ohio St.3d 121, 661 N.E.2d 1008 (1996) (quoting In re Perales, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977)) (preponderance standard); Or.Rev.Stat. § 109.119 (1999) (amended 2001) (preponderance standard).
[39] Todd v. Todd, 989 P.2d 141, 142-43 (Alaska 1999).
[40] The full text of AS 25.20.060(a) provides:

If there is a dispute over child custody, either parent may petition the superior court for resolution of the matter under AS 25.20.060-25.20.130. The court shall award custody on the basis of the best interests of the child. In determining the best interests of the child, the court shall consider all relevant factors including those factors enumerated in AS 25.24.150(c). In a custody determination under this section, the court shall provide for visitation by a grandparent or other person if that is in the best interests of the child.
Lisa also focuses on AS 25.20.065 which permits a grandparent in an original proceeding to petition for an order establishing visitation rights. This statute does not apply to this case as the McTaggarts are not grandparents and they did not proceed by way of an original proceeding.
[41] 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).
[42] Id. at 60, 120 S.Ct. 2054.
[43] Id. at 57, 120 S.Ct. 2054.
[44] Id. at 63, 120 S.Ct. 2054.
[45] Id.
[46] Id. at 62, 120 S.Ct. 2054.
[47] Id. at 67, 120 S.Ct. 2054.
[48] Id.
[49] Id. at 68, 120 S.Ct. 2054.
[50] Id.
[51] Id. at 69-70, 120 S.Ct. 2054.
[52] Id. at 71, 120 S.Ct. 2054.
[53] Id. at 61, 71, 120 S.Ct. 2054.
[54] Id. at 73, 120 S.Ct. 2054.
[55] Id. at 67, 120 S.Ct. 2054.
[56] Id. at 73, 120 S.Ct. 2054. While declining to consider the Washington Supreme Court's finding of facial invalidity, the plurality nonetheless observed that, "[b]ecause much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a per se matter." Id.
[57] Id. at 75-80, 120 S.Ct. 2054.
[58] Id. at 75, 120 S.Ct. 2054.
[59] Id. at 73, 120 S.Ct. 2054.
[60] Id. at 77, 120 S.Ct. 2054.
[61] Id.
[62] Id. at 79, 120 S.Ct. 2054.
[63] Id. at 80-91, 120 S.Ct. 2054.
[64] Id. at 81, 120 S.Ct. 2054.
[65] Id. at 94, 120 S.Ct. 2054.
[66] Id. at 99-100, 120 S.Ct. 2054.
[67] Id. at 100, 120 S.Ct. 2054.
[68] Justice Scalia dissented on the ground that parents have no constitutional right to direct the upbringing of their children free from state interference. Id. at 92, 120 S.Ct. 2054. Justice Thomas noted that the parties had not raised the substantive due process point on which Justice Scalia relied and expressed no view on that point. "Consequently," he agreed with the lead opinion, but indicated that he would apply "strict scrutiny to infringements of fundamental rights" and thus require a compelling governmental interest to justify interference with "a fit parent's decision regarding visitation with third parties." Id. at 80, 120 S.Ct. 2054.
[69] Id. at 70, 120 S.Ct. 2054.
[70] The court found that "Lisa Evans has a limited cognitive ability and through this and her anger together she is incapable in her present condition of seeing her needs as separate from Cameron's and Shawn's...."
[71] Alaska R. Civ. P. 90.3, cmt. II.
[72] Lisa makes two other points that we determine summarily. She argues that Shawn's father, Eric Evans, should have been notified prior to awarding visitation to the McTaggarts. According to Lisa, Eric has not seen Shawn since Shawn was four months old. As a practical matter, therefore, visitation with the McTaggarts will not interfere with Eric's parental rights. We note that the superior court required that notice be given to Eric advising him of the visitation order and giving him 120 days within which to seek reconsideration of the order. The record does not indicate that he responded.

Lisa also argues that the court abused its discretion when it denied her motion for relief from judgment made on May 14, 2002. The motion mainly reargued evidence already in the record. It also sought to introduce new evidence. To the extent that the motion relied on the grounds of mistake under Civil Rule 60(b)(1) it was unpersuasive; it was also untimely since it was filed after the time for appeal had expired. Alaska Placer Co. v. Lee, 502 P.2d 128 (Alaska 1972). Insofar as it sought to introduce new evidence, the motion made no showing that the evidence was newly discovered or that the standards of Civil Rule 60(b)(2) relating to newly discovered evidence had been met.
[1] Joseph v. State, 26 P.3d 459, 468-69 (Alaska 2001) ("Stare decisis compels us to give precedential value to our prior holdings.... But it is not clear that [two previous cases] actually resolved the issue now before us. A case is not binding precedent if its holding is only implicit or assumed.... Dictum is not holding." (Footnotes omitted.))
[2] Todd v. Todd, 989 P.2d 141, 143 (Alaska 1999); J.W. v. R.J., 951 P.2d 1206, 1210 n. 3 (Alaska 1998); Buness v. Gillen, 781 P.2d 985, 989 n. 7 (Alaska 1989); Britt v. Britt, 567 P.2d 308, 310 (Alaska 1977).
[3] C.R.B. v. C.C., 959 P.2d 375, 380 (Alaska 1998).
[4] 959 P.2d at 380 (citing Carter v. Novotny, 779 P.2d 1195, 1197 (Alaska 1989)). The dissenting opinion probably misconstrues C.R.B. v. C.C. and Carter v. Novotny in asserting that C.R.B. and Carter "were not addressing the question of burden of proof, but were most likely referring to the substantive standard." Dissent at 1093 n. 3. I think that the relevant passages must be read as addressing the standard of proof, not the substantive standard. E.g., 959 P.2d at 380 (referring to "clear evidence").
[5] We have sometimes referred to "clear evidence" as equivalent to the clear and convincing standard. Vezey v. Green, 35 P.3d 14, 24-25 (Alaska 2001) (treating "clear and convincing evidence" standard in adverse possession case to require "clear evidence"); State v. Alaska State Employees Ass'n/AFSCME Local 52, 923 P.2d 18, 28 n. 12 (Alaska 1996) (applying National Labor Relations Board's "clear and convincing evidence rule" for adoption of labor agreements but finding no "clear evidence" showing state housing corporation adopted ongoing obligation to bargain with state employees association); Spenard Action Comm. v. Lot 3, Block 1, Evergreen Subdivision, 902 P.2d 766, 775 n. 16 (Alaska 1995) (citing New York case requiring "clear evidence" in support of applying "clear and convincing evidence" to establish public nuisance).
[6] See, e.g., Britt, 567 P.2d at 310, where the choice of the applicable proof standard was irrelevant, because we reversed both because it was clear error to find parental unfitness given the evidence and because the trial judge erroneously stated that neither party bore the burden of proof; applying the clear and convincing standard would not have altered the appellate result. Id. at 310-11. The outcome in other cases likewise does not seem to have turned on the choice of standard. See, e.g., J.W.
[7] The parties did not brief the issue, for example, in Buness, C.R.B., J.W., or Todd.

In Todd, the trial court applied the preponderance standard in awarding custody to the grandparents; we affirmed. The parents did not contend on appeal the more rigorous proof standard applied.
In Buness, the superior court rejected the stepfather's custody claim on summary judgment; we concluded that genuine, material fact disputes precluded summary judgment, and remanded. There is no indication in the opinion that the evidence that created a factual dispute under the preponderance standard was insufficient to do so under the clear and convincing standard. In mentioning the preponderance standard, we simply cited to Britt. 781 P.2d at 989 n. 7.
So far as I can tell, the issue was previously briefed only in one case in this court, Britt. Appellant there briefly asked the court to adopt the clear and convincing standard. The appellee did not address the standard of proof and the court never discussed, much less rejected, the more rigorous standard requested by the appellant. It simply announced that the preponderance standard applied, and did not explain that it was choosing that standard, or its rationale for citing that standard. 567 P.2d at 310.
[1] 540 P.2d 1051, 1055 (Alaska 1975).
[2] Todd v. Todd, 989 P.2d 141, 143 (Alaska 1999); J.W. v. R.J., 951 P.2d 1206, 1210 n. 3 (Alaska 1998); Buness v. Gillen, 781 P.2d 985, 989 n. 7 (Alaska 1989); Britt v. Britt, 567 P.2d 308, 310 (Alaska 1977).
[3] While "clearly shown" is in our early cases, these precede Turner. Both Carter v. Novotny, 779 P.2d 1195, 1197 (Alaska 1989) and C.R.B. v. C.C., 959 P.2d 375, 380 (Alaska 1998) use the phrase "clear evidence." These cases, however, were not addressing the question of burden of proof, but were most likely referring to the substantive standard.
[4] 567 P.2d at 310.
[5] Buness v. Gillen, 781 P.2d 985, 989 n. 7 (Alaska 1989). Justice Rabinowitz wrote a concurring opinion in Turner addressing his concerns about how the court characterized the substantive test. 540 P.2d at 1056. This did not prevent him from then using the "preponderance of the evidence" test in Buness.
[6] 951 P.2d at 1210 n. 3.
[7] 959 P.2d at 375.
[8] Op. at 1084-85.
[9] Carter, 779 P.2d at 1197, cited in C.R.B., 959 P.2d at 380.
[10] 781 P.2d at 989 n. 7.
[11] C.R.B., 959 P.2d at 380.
[12] 989 P.2d 141.
[13] Op. at 1085.
[14] Todd, 989 P.2d at 143.
[15] Id.
[16] Id.
[17] Todd, 989 P.2d at 143 ("[T]he burden is on the non-parent to prove, by a preponderance of the evidence, that parental custody would be `clearly detrimental.'") (emphasis added); J.W., 951 P.2d at 1210 n. 3 ("The nonparent has the burden of proving the detriment by a preponderance of the evidence.") (emphasis added); Buness, 781 P.2d at 989 n. 7 ("The burden of showing detriment to the child, by a preponderance of the evidence, is on the non-parent.") (emphasis added); Britt, 567 P.2d at 310 ("Turner makes clear that in [custody litigation between a parent and a non-parent] the non-parent must overcome by a preponderance of the evidence the preference for parental custody.") (emphasis added).
[18] Op. at 1085-86.
[19] See cases cited supra note 17.
[20] State v. Fremgen, 914 P.2d 1244, 1245 (Alaska 1996) (citation omitted).
[21] Id. (quotation marks and citation omitted).
[22] Op. at 1085-86.
[23] Op. at 1085-87.
[24] 43 P.3d 150, 154 (Alaska 2002).
[25] 61 P.3d 438, 442 (Alaska 2002) (quoting superior court).
[26] Id. at 441-42.
[27] 779 P.2d 1195, 1196-97 (Alaska 1989).
[28] Id. at 1197.
[29] Concurrence at 1092.
[30] Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (quoting In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)).
[31] State, Dep't of Health & Soc. Servs. v. M.L.L., 61 P.3d 438 (Alaska 2002); Carter v. Novotny, 779 P.2d 1195 (Alaska 1989).
[32] See James G. Dwyer, Parent's Religion and Children's Welfare: Debunking the Doctrine of Parent's Rights, 82 CAL. L.REV. 1371, 1374, 1377, 1447 (1994) ("I propose that children's rights, rather than parent's rights, be the legal basis for protecting the interests of children."); see also Barbara A. Atwood, The Child's Voice in Custody Litigation: An Empirical Survey and Suggestions for Reform, 45 ARIZ. L.REV. 629, 674 (2003) ("The growing legal recognition of children's rights ... strongly support[s] the conclusion that family courts should take into account the views of children able and willing to express them.").
[33] A.H. v. State, Dep't of Health & Soc. Servs., 10 P.3d 1156, 1166 (Alaska 2000). In T.F. v. State, we recognized that our rule that the State has no duty to undertake family unification efforts before paternity is established is "driven by the policy of protecting children in need of aid." 26 P.3d 1089, 1095 (Alaska 2001).
[34] See Shurupoff v. Vockroth, 372 Md. 639, 814 A.2d 543, 555 (2003).
[35] Id. at 555-56.
[36] Id. at 553
[37] AS 47.10.011.
[38] AS 47.10.011(6) & (8).
[39] AS 47.10.011(8).
[40] Id.; AS 47.10.011(6).
[41] AS 47.10.080(c)(1).
[42] Nichols v. Mandelin, 790 P.2d 1367, 1371-72 (Alaska 1990).
[43] Id.
[44] Id. at 1372.
[45] See AS 25.20.110(a); Maxwell v. Maxwell, 37 P.3d 424, 425 (Alaska 2001).
[46] AS 47.10.088(1).
[47] Shurupoff, 814 A.2d at 552.
[48] Id.
[49] 79 P.3d 50, 55 (Alaska 2003).
[50] See, e.g., JOSEPH GOLDSTEIN, ET AL., BEFORE THE BEST INTERESTS OF THE CHILD (1979).
[51] Marsha Garrison, Parent's Rights v. Children's Rights: The Case of the Foster Child, 22 N.Y.U. REV. L. & SOC. CHANGE 371, 372 (1996) (quoting Lehr v. Robertson, 463 U.S. 248, 262, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)).
[52] See Dwyer supra note 32, at 1377.
[53] PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.18 cmt. c (2002).
[54] Id. (emphasis added).