Lisa C. TODD, Appellant,

v.

Robyn TODD [1] and Larry and Elizabeth Todd, Appellees.

No. S–8803.

Supreme Court of Alaska.

Oct. 8, 1999.

John C. Pharr, Law Offices of John C. Pharr, Anchorage, for Appellant.

Tara N. Logsdon, Tull & Associates, Palmer, for Appellees.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

### I. INTRODUCTION

In a divorce proceeding between Robyn and Lisa Todd, the superior court awarded sole physical and legal custody of the couple's only child, K.T., to K.T.'s paternal grandparents, intervenors Larry and Elizabeth Todd. Lisa appeals that decision. We affirm.

### II. FACTS AND PROCEEDINGS

K.T. was born June 12, 1990. On November 4, 1991, Robyn and Joe Harvey, Lisa's brother, robbed the Hub Bar in Anchorage. During that robbery the owner of the bar was fatally shot.[2] Robyn was convicted of first-degree robbery, second-degree murder, and third-degree assault; he was sentenced to consecutive sentences for those crimes.[3] Lisa and Robyn were married in March 1993, while Robyn was in prison in Seward. Robyn is now incarcerated in Arizona.

It is undisputed that from the time K.T. was approximately eight months old to the present, she lived for much of the time in Wasilla with Larry and Elizabeth. Larry is Robyn's father and Elizabeth is Robyn's

---

1. Robyn Todd has not participated in this appeal.

2. There is evidence that Robyn and others participated in a series of armed robberies. An accomplice to one of these alleged crimes told police officers that Lisa accompanied them to one of these crimes, but stayed in the car with the infant K.T.

3. We upheld his conviction and sentence. *See Todd v. State,* 917 P.2d 674 (Alaska 1996).

step-mother. They have been married for twenty-four years and have owned their home in Wasilla for the last twenty-two years. Lisa disagrees sharply with Larry and Elizabeth as to the amount of time K.T. was in Larry and Elizabeth's care. After substantial litigation of the issue, the trial court found that Larry and Elizabeth had been K.T.'s primary caretakers for about seventy percent of K.T.'s life.[4] The following is a brief chronology of the relevant events.

*1991*

Larry and Elizabeth first met K.T. when the child was approximately eight months old. At that point, they began caring for her. By the end of 1991, K.T. was staying with Larry and Elizabeth for extended periods of time.

*1992*

In the spring of 1992, Lisa left K.T. with Larry and Elizabeth for at least seven weeks while she was out of the state to avoid involvement in the criminal case. Lisa, with the assistance of Larry and Elizabeth, moved into an apartment in Wasilla in August 1992.

*1993*

In June 1993 Lisa (now married to Robyn) moved to Seward to be close to him. It is unclear if K.T. ever moved with Lisa to Seward.

*1994*

Larry and Elizabeth contend that K.T. was living with them on a full-time basis by 1994. Lisa states that K.T. was shuttled back and forth between the parties in the early part of the year. Both parties agree that K.T. spent the summer with Larry and Elizabeth at their Lake Iliamna lodge.

*1995*

Lisa testified that she had K.T. sixty percent of the time and that Larry and Elizabeth had K.T. forty percent of the time during 1995. Elizabeth testified that K.T. was with her and Larry one hundred percent of the time from January to June. Both sides agree that K.T. spent most of the summer with Larry and Elizabeth at the lodge. In the fall, Lisa enrolled K.T. in kindergarten in Anchorage, but K.T. spent weekends with Larry and Elizabeth. K.T. moved in with Larry's daughter, Christy, after Thanksgiving so that K.T. could finish the semester in Anchorage. This was done to allow Lisa to attend Charter College.

*1996*

In January 1996 Larry and Elizabeth enrolled K.T. in a Wasilla school and she lived with Larry and Elizabeth full time until the end of the school year. That summer, Lisa took K.T. to Kansas for two months; K.T. spent the remainder of the summer at the lodge with Larry and Elizabeth. In the fall, K.T. again attended school in Wasilla and continued to live with Larry and Elizabeth.

*1997*

In February 1997 Lisa, now residing in Kansas with her parents, filed for divorce in that state. At that time, K.T. was still living in Wasilla with Larry and Elizabeth. Robyn then filed for divorce in Alaska in March 1997. In his complaint, he sought joint legal custody, with primary physical custody to Lisa, and liberal visitation rights for Larry and Elizabeth. Lisa answered by seeking sole legal and primary physical custody of K.T.

In May, Larry and Elizabeth intervened and sought legal and primary physical custody of K.T. The court granted Larry and Elizabeth interim physical custody of K.T. But Lisa retained shared legal custody.

*1998*

In June 1998 the trial court issued a final divorce decree, a final child custody decree, and findings of fact and conclusions of law. The court gave Larry and Elizabeth sole legal and physical custody of K.T. Lisa appeals that decision.

## III. DISCUSSION

### A. Standard of Review

We have previously held that we will disturb the trial court's resolution of child custo-

---

4. The trial court found that Larry and Elizabeth had been K.T.'s primary caretakers for two-

thirds to three-fourths of the child's life.

dy issues "only if the record shows an abuse of discretion or if controlling findings of fact are clearly erroneous. Whether factual findings are sufficient to support an award of custody to a non-parent is a legal issue to which we apply our independent judgment." [5]

### B. Child Custody Legal Standards

■ We apply a different legal standard in custody disputes between parents than in custody disputes between parents and non-parents. In custody disputes between parents, custody is determined "in accordance with the best interests of the child." [6] However, in a child custody dispute between parents and non-parents, parental custody is considered to be "preferable and only to be refused where clearly detrimental to the child." [7]

■ We have previously noted that when a child has resided with a non-parent for a significant amount of the child's life, "severing the bond between the psychological parent and the child may well be clearly detrimental to the child's welfare." [8] However, even if the non-parent has been the child's primary caregiver, the burden is on the non-parent to prove, by a preponderance of the evidence, that parental custody would be "clearly detrimental." [9]

### C. The Superior Court Did Not Err in Granting Larry and Elizabeth Custody of K.T.

■ The court found that the preponderance of evidence supported an award of custody of K.T. to Larry and Elizabeth. [10] In doing so, the court found that:

(1) K.T.'s strongest psychological bonding has been with Larry and Elizabeth; Larry and Elizabeth's physical and emotional nurturing and caretaking also was instrumental in shaping K.T.'s sense of her place in the universe. Specifically, the trial court found:

[C]learly, over the course of the seven years, the strongest psychological bonding and sense of place of being in the universe has been through the physical and emotional nurturing and caretaking of Larry and Elizabeth Todd, not through that of Lisa.... Larry and Elizabeth Todd, for about two-thirds to three-quarters of this child's life, have been her primary caretaker and have been the most stability that she has had....

It is important for the child's welfare that the child be in a situation where the child is nurtured constantly in a way that they have a good, healthy springboard to adult life....

... [H]ere the paternal grandparents[ ] have stepped into the shoes of being the primary caretakers, nurturers, and the constant, over the seven, 7½, almost eight years, for the basic statutory needs of a child that need to [be] met under our custody statute.

(2) Because K.T.'s bonds with her grandparents are so strong, it would be detrimental to K.T. to destroy those bonds. In this regard, the trial court said:

And because the child's bonds have been so strong with the ... grandparents with regard to the emotional, psychological, and physical nurturing that's taken place from age 1½ through age 7½ here, that it would be detrimental to her to destroy those.

It appears that the physical symptoms that the child has exhibited as Lisa has become more of a presence in her life over the last six months illustrate that to go for a big change, even bigger than what we have now, would be emotionally, psychologically harmful, detrimental to [K.T.] Even Dr.

---

5. *J.W. v. R.J.*, 951 P.2d 1206, 1209 (Alaska 1998) (citations omitted).

6. AS 25.24.150(c).

7. *Turner v. Pannick*, 540 P.2d 1051, 1055 (Alaska 1975).

8. *Buness v. Gillen*, 781 P.2d 985, 989 n. 8 (Alaska 1989) (citations omitted).

9. *Britt v. Britt*, 567 P.2d 308, 310 (Alaska 1977) (quoting *Turner*, 540 P.2d at 1055).

10. The court also found that Lisa had abandoned K.T. But since we are affirming the court's first finding, we need not review this finding.

Collins, ... the witness that Lisa called, basically said no, ... that [it] would be detrimental to the child right now to do that.

(3) Lisa is not ready to be K.T.'s primary custodian, and K.T. should be given the message that she "can continue to bond with Larry and Elizabeth ... without resistance from Lisa." Specifically, the trial court found:

It does appear as noted that Lisa is just not motivated right now to put together a package where she would be the primary custodian and the child would be given [a] healthy message that she can continue to bond with Larry and Elizabeth without arrows flying back between the two families here.

[Lisa has] never established and has continued to let loosen or weaken the general[ly] very strong bond that a child will develop with his or her primary parent.

(4) "[i]t would be psychologically, emotionally and possibly physically detrimental to [K.T.] to be placed primarily in Lisa Todd's care." In this regard, the trial court found:

[H]er security and her structure over the five to seven years really come from what ... she's been given by Larry and Elizabeth.... Lisa has been during that period of time more like a visiting parent, not followed through with promises.... [W]hat really would be detrimental to the child from a psychological and emotional standpoint is that through this whole five to seven years, Larry and Elizabeth have tried to foster the situation as one of extended family, ... but if Lisa were to be given primary physical custody, it just does not appear that she is capable of continuing to nurture all those relationships in the same positive way, and ... that would be very harmful to [K.T.]

After a careful review of the record we find that there is adequate factual support for each of these findings. Accordingly, they are not clearly erroneous.

The trial court heard testimony and read reports written by several experts who were familiar with the case. This information supports the court's award of custody to Larry and Elizabeth. For example, as part of a court-ordered custody investigation, the parties were instructed to undergo an assessment by psychologist Dr. Susan LaGrande. Dr. LaGrande performed two separate evaluations, the first for the interim custody hearing in August 1997 and the second for the final custody hearing conducted in March and April 1998. Lisa declined to participate in the second evaluation.

In her summary of these two evaluations, Dr. LaGrande wrote the following in recommending that Larry and Elizabeth retain custody of K.T.:

For this child's psychological needs it is important to recognize that [Larry and Elizabeth's] home has been her primary stable and consistent home. Abrupt transition from this or a disruption of this support system puts this child in emotional jeopardy. A child relies [on] stability and consistency to develop a strong sense of self worth, empathy, and ego strength. It is from this platform that a child develops healthy coping mechanisms and problem solving strategies. If this is disrupted and impaired it can [jeopardize] this child's ability to form meaningful relationships in her future. To date a demonstration that stability and consistency can be provided in the mother's home has not been shown to this evaluator....

Larry, Elizabeth, Lisa, and K.T. also met with custody investigator Susan Arth. Like Dr. LaGrande, Ms. Arth recommended, among other things, that Larry and Elizabeth receive primary physical custody of K.T. and that they share legal custody with Lisa. She based this recommendation on her findings that:

Lisa's parenting skills are not so limited that there is cause to contact the Division of Family and Youth Services. However, ... [K.T.] has resided mostly with her paternal grandparents....

It [ ] appears that Larry and Elizabeth have served a much greater role in the child's life than has her mother.... To date Larry and Elizabeth have been meeting [K.T's] needs. This Investigator is not convinced that Lisa can. Lisa seems to have poor judgement about her daughter's

need for safety, nurturing, and emotional support. . . .

Repeatedly, [Lisa] abandoned her daughter to take care of her own needs, which she experiences as more pressing. It is electrifying that Lisa probably took [K.T.] to at least one armed robbery and served as a lookout.

Laudably, Lisa and K.T. began therapy to "work on the mother-daughter relationship" with Dr. Alfred Collins. Dr. Collins testified that the bond between Lisa and K.T. is "strong but also threatened with some ambivalence ... on K.T.'s part." Dr. Collins further testified that placing K.T. primarily in Lisa's care would disrupt "the life that she has got with her grandparents right now [and] would be difficult for her."

Taken together, the testimony and experts' reports provide adequate grounds to support placing K.T. with Larry and Elizabeth.

## IV. CONCLUSION

Because the record supports the conclusion that placement of K.T. with Lisa would be clearly detrimental to the welfare of the child, we AFFIRM the superior court.