*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| HELENA DARA, f/k/a HELENA HARRIS, | ) ) ) | Supreme Court No. S-16414 |
| Appellant, | ) ) | Superior Court No. 3AN-14-04479 CI |
| v. | ) ) | O P I N I O N |
| HELENA GISH and HOWARD GISH, | ) ) ) | No. 7201 – September 22, 2017 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Helena Dara, pro se, Memphis, Tennessee, Appellant. Herbert M. Pearce, Law Office of Herbert M. Pearce, Anchorage, for Appellees.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

WINFREE, Justice.

## I.     INTRODUCTION

The superior court granted joint legal and primary physical custody of a child to his maternal grandmother and step-grandfather. The child's mother — who retained joint legal custody and visitation rights — appeals, arguing that: she was entitled to court-appointed counsel during the proceedings; the order violates her Fourteenth Amendment right to direct the upbringing and education of her child; and the

court erred in its custody determination. Because the mother provides no legal basis for her claim to court-appointed counsel, we affirm the court's decision denying that request. Because the court applied the correct constitutional and legal standard for third-party custody, its factual findings were not clearly erroneous, and its exercise of discretion was not unreasonable, we affirm the court's order awarding joint legal and primary physical custody of the child to the grandparents.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Helena Dara's son was born in 2006. Dara's mother and step-father, Helena and Howard Gish, have been a significant presence in the boy's life. In March 2009, at Dara's request, the Gishes took the boy into their home and became his primary care givers because his parents could not adequately provide for him. In September, with Dara's consent, the Gishes were appointed his legal guardians. Through 2012 Dara had frequent contact with her son, including overnight visitation.

Dara's son began receiving Individual Education Plans (IEPs) from the local school district in 2009. He received a variety of reading and language assessments around 2012; a neuropsychological evaluation from Dr. Kristi Fuller in 2013; and speech, language, and occupational therapy evaluations in January 2014. Around January 2014 the Gishes' attorney requested that Dr. Alfred Collins, a licensed psychologist, provide an opinion whether Helena Gish was the boy's "psychological parent"; Dr. Collins returned an opinion the next month that she was. In that opinion Dr. Collins found that the boy was "developmentally very delayed" and that although the boy had "made some progress over the past five years, due in large part to the efforts of Helena Gish," he nonetheless "still remains far behind." Dr. Collins further noted that the "Gishes have consistently provided the high level of support that [the boy] has required (OT, speech therapy, evaluations, etc.)."

Later testing — performed by Dr. Fuller in 2016 when the boy was almost ten years old — found "low-average general intellectual abilities," "global deficits, with basic reading skills falling at an early first-grade level, and math calculation skills at an early second-grade level," and "the presence of dyslexia." Given the severity of the boy's dyslexia, Dr. Fuller recommended that he continue working with a speech pathologist the Gishes had arranged.

### B. Proceedings

In July 2012 Dara brought an action to terminate the guardianship, which the Gishes contested. Around the same time the Gishes also filed a petition to adopt Dara's son. The adoption petition was denied in March 2013, and the guardianship was terminated in August 2014. In January 2014, after the adoption was denied but before the guardianship was terminated, the Gishes filed a separate complaint for custody and visitation, which underlies this appeal. The Gishes were represented by private counsel throughout the proceedings. Dara had private counsel until May 2015, when she notified the firm that she no longer needed their services.

In March 2015 the parties arrived at a settlement agreement under which Dara was granted primary physical and sole legal custody, and the Gishes received regular visitation rights. The parties stipulated that "a strong and heartfelt bond" had developed between the boy and the Gishes and that it was in his "best interest that he have regular and consistent visitation" with them. But less than two weeks after the parties reached the agreement, Dara left the state with her son without notifying the Gishes and cut off all communication with them. The Gishes hired a private investigator and discovered that Dara and her son were in Tennessee; another family member subsequently informed them of Dara's precise whereabouts. After the Gishes informed the superior court that Dara had violated the settlement agreement's visitation provisions and left the state with the boy, the court issued an order granting them interim custody.

In July 2015 the Gishes traveled to Tennessee and, using the interim custody order, secured the assistance of local authorities in obtaining physical custody of the boy and bringing him back to Alaska.

The Gishes moved to set aside the settlement agreement and resumed their custody action against Dara when they returned to Alaska. Trial was scheduled for February 2016. At a November 2015 status hearing Dara informed the court she was no longer represented by counsel and was having some difficulty knowing what to file; she had requested appointed counsel at the legal aid center but had been denied. Dara again brought up the issue of appointed counsel at a January 2016 pretrial conference, this time requesting that the court appoint her counsel under AS 25.23.180(h), which provides a right to counsel in parental rights termination proceedings. The court informed Dara that the statute did not pertain to custody determinations, and that the court knew of no avenue under which it might be authorized to appoint counsel in a case such as hers.

In February 2016 the parties agreed to a temporary visitation schedule under which the boy would live with Dara and her new husband in Tennessee over the following summer. Trial was continued and a status and custody hearing was scheduled for July. In April the Gishes sent Dara a letter suggesting her son's progress in overcoming his special needs might be jeopardized by the summer away from his doctors and therapists in Alaska and proposing an alternative visitation schedule. Dara declined to alter the agreed-upon schedule and in May filed a motion to enforce visitation. The court held a hearing and issued an order enforcing the original visitation agreement. The court noted Dara's son might lose some progress he had made in therapy but was reassured by testimony from Dara and her new husband that they had enrolled the boy in a summer therapy program at the Sylvan Learning Center.

Dara's son spent the summer in Tennessee with Dara and her husband, a man she had known for only about a month before the marriage. Dara's son did not

attend the program in which Dara had testified to enrolling him. In late July the court held the scheduled status and custody hearing. Both Helena and Howard Gish attended in person; Dara and her husband participated telephonically. The court took care to review the third-party custody legal standard with Dara at the beginning of the proceedings, and on numerous occasions the court explained hearing procedures. Helena and Howard Gish testified about the boy's special needs, what actions they had taken to address those needs, their concerns about Dara's capacity to care for the boy, and why they were seeking custody. Dara raised concerns about the Gishes' care-giving decisions and the safety and stability of the Gishes' home. Her concerns about the Gishes' care giving stemmed in part from her own experience being raised by the Gishes, which she viewed unfavorably. Dara and her husband also testified to their understanding of the boy's special needs and what steps they had taken to address those needs. On cross-examination the Gishes' attorney raised the issue of the stability of Dara's home life, pressing Dara's husband for details concerning his relationship with his own five children. After an argumentative exchange Dara's husband eventually had an extended, loud, and profane outburst, for which he later apologized.

Three days after the hearing concluded the superior court issued its oral decision on record. The court found the Gishes had proved by clear and convincing evidence that the boy would suffer clear detriment if sole custody were granted to Dara; it granted the Gishes and Dara joint legal custody (with final decision-making authority vested in the Gishes), granted the Gishes primary physical custody, and granted Dara regular visitation. Dara appeals the superior court's final custody order.

## III. STANDARD OF REVIEW

"We . . . review constitutional questions de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[1] "Likewise, '[w]hether the court applied the correct standard in a custody determination is a question of law we review de novo.' "[2]

"The superior court has 'broad discretion in custody awards.' "[3] Consequently, "[w]e will reverse a superior court's custody and visitation determination 'only if the superior court has abused its discretion or if its controlling findings of fact are clearly erroneous.' "[4] We will find an abuse of discretion when the superior court " 'consider[s] improper factors in making its custody determination, fail[s] to consider statutorily mandated factors, or assign[s] disproportionate weight to particular factors while ignoring others.' We review factual findings, including determinations of psychological parent status, for clear error."[5] Factual findings are "clearly erroneous when a review of the record leaves us with the definite impression that a mistake has

---

[1] *Ross v. Bauman*, 353 P.3d 816, 823 (Alaska 2015) (omission in original) (quoting *Skinner v. Hagberg*, 183 P.3d 486, 489 (Alaska 2008) (footnote omitted)).

[2] *Osterkamp v. Stiles*, 235 P.3d 178, 184 (Alaska 2010) (alteration in original) (quoting *Elton H. v. Naomi R.*, 119 P.3d 969, 973 (Alaska 2005)).

[3] *Id.* at 183 (quoting *In re Adoption of Missy M.*, 133 P.3d 645, 648 (Alaska 2006)).

[4] *Id.* (quoting *R.I. v. C.C.*, 9 P.3d 274, 277 (Alaska 2000)) (citing *Skinner*, 183 P.3d at 489).

[5] *Id.* (alterations in original) (footnote omitted) (quoting *In re Missy M.*, 133 P.3d at 648) (citing *Kinnard v. Kinnard*, 43 P.3d 150, 153 (Alaska 2002)).

been made."[6]  "[W]e ordinarily will not overturn a trial court's finding based on conflicting evidence," nor will we "re-weigh evidence when the record provides clear support for the trial court's ruling; it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[7]

## IV.  DISCUSSION

Dara challenges the superior court's decision to award custody to the Gishes on three grounds:  (1) she was entitled to appointed counsel; (2) the decision violated her Fourteenth Amendment right to direct the upbringing and education of her child; and (3) the superior court erred in its custody determination.

### A.  Dara Was Not Entitled To Appointed Counsel.

Dara argues that she should have received court-appointed counsel, stating that she "asked for [counsel] and was denied and I believe that this is one reason that I was unable to get my child back."  Dara raised this issue twice before the superior court. At a status hearing in November 2015 the court inquired why in some time it had not received any communication from Dara; she responded that she was not sure what she should file because she had no money for an attorney, and that she had gone to legal aid and requested an attorney but was denied.  In late January 2016, about one week before the then-scheduled trial, Dara requested appointed counsel under AS 25.23.180(h), which provides a right to counsel in parental rights termination proceedings.  The court informed her that the statute did not apply because this was a custody proceeding and parental rights were not being terminated.  The court explained it was aware of case law requiring appointed counsel in custody cases where the state provided representation for

---

[6]      *Id.* (citing *In re Missy M.*, 133 P.3d at 648).

[7]      *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009) (quoting *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008)).

the opposing party[8] but that situation did not apply, and the court was aware of no other avenue authorizing it to appoint counsel.

Dara's claim — "that when somebody is trying to take a child from a parent and said parent does not have the means to afford an attorney that one shall be appointed" — is accurate in the parental rights termination context,[9] but not in a custody case when neither party has the benefit of state-appointed counsel.[10] In our recent *Dennis O. v. Stephanie O.* decision we held that in custody cases "self-represented indigent parents facing opposing parents represented by private counsel are not, as a class, deprived of due process rights solely because they do not have counsel."[11] The reasoning in *Dennis O.* applies also in the third-party custody context; if the third party seeking custody does not enjoy state-appointed counsel then no "fairness concerns" demand, as a rule, appointing counsel for the opposing parent.[12] Dara presents no argument causing us to reconsider that holding or to distinguish its operation in the third-

---

**8** *See Flores v. Flores*, 598 P.2d 893, 896 (Alaska 1979) (holding "that there is a constitutional right to counsel" in custody cases "where the other parent has an attorney supplied by a public agency").

**9** *See* AS 25.23.180(h) ("The respondent to a petition filed for the termination of parental rights . . . is entitled to representation in the proceedings by an attorney.").

**10** *Cf. Flores*, 598 P.2d at 895 (holding that in custody cases where one parent is represented by state-appointed counsel, "[f]airness alone dictates that the [other parent] should be entitled to a similar advantage").

**11** 393 P.3d 401, 409 (Alaska 2017).

**12** *Id.* at 408.

party custody context; we reject her claim that the superior court erred by denying appointed counsel.[13]

## B. The Superior Court Applied The Correct Constitutional And Legal Standard.

### 1. The state's third-party custody legal framework protects parents' constitutional rights.

Dara argues the superior court violated her Fourteenth Amendment substantive due process right "to direct the upbringing and education of [her] child[]," citing a number of United States Supreme Court cases establishing that right.[14] Dara is correct that "[t]he 'right to the care and custody of one's own child is a fundamental right recognized by both the federal and state constitutions' [that] therefore 'falls within the protections of the due process clause.' "[15] The Gishes do not contest this.

But, as the Gishes note, we have established a legal framework in third-party custody cases under which parents' constitutional rights are appropriately and effectively balanced against the child's welfare.[16] We have regularly applied this legal

---

[13] Under *Dennis O.* a litigant may argue an individual due process right to counsel given a case's particular circumstances. *See id.* at 409-11. Dara has not suggested, and the record does not reflect, any due process concerns indicating appointed counsel might have been uniquely necessary in her case.

[14] *See* U.S. Const. amend. XIV, § 1; *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *Wisconsin v. Yoder*, 406 U.S. 205, 232-33 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 164-66 (1944); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923).

[15] *Alex H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 389 P.3d 35, 48 (Alaska 2017) (footnote omitted) (quoting *Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1227-28 (Alaska 2008)).

[16] *See Evans v. McTaggart*, 88 P.3d 1078, 1082, 1089-90 (Alaska 2004) (continued...)

framework in third-party custody cases without challenge to its constitutionality, and Dara presents no argument why we should consider a departure now.[17] If the superior court applied the correct third-party custody legal standard in this case, then there is no reason to question the constitutionality of its decision.

### 2.    The superior court applied the correct legal standard.

A "non-parent who has a significant connection with the child has standing to assert a claim for custody."[18] "[E]stablishing psychological parent status 'is more demanding than the "significant connection" status that a third party must have in order to seek custody.' "[19] Once standing is established, a third party seeking custody must "show by clear and convincing evidence that the parent is unfit or that the welfare of the child requires the child to be in the custody of the non-parent."[20] To satisfy the burden under the "welfare of the child" analysis, the "non-parent must show that the child would suffer clear detriment if placed in the custody of the parent."[21] In determining clear detriment, "analysis is not limited to examining the child's relationship with the legal

---

[16]    (...continued) (discussing constitutionality of legal framework applied in third-party custody cases; holding that related legal framework used in third-party visitation cases is not unconstitutional under relevant precedent).

[17]    *See, e.g.*, *Osterkamp v. Stiles*, 235 P.3d 178, 184-89 (Alaska 2010); *Elton H. v. Naomi R.*, 119 P.3d 969, 975-77 (Alaska 2005); *Kinnard v. Kinnard*, 43 P.3d 150, 153-55 (Alaska 2002).

[18]    *Evans*, 88 P.3d at 1081 (quoting *Buness v. Gillen*, 781 P.2d 985, 988 (Alaska 1989), *overruled on other grounds by Evans*, 88 P.3d at 1085 n.34 (requiring the clear and convincing evidence standard in third-party custody cases)).

[19]    *Osterkamp*, 235 P.3d at 184 n.17 (quoting *Evans*, 88 P.3d at 1082).

[20]    *Id.* at 185 (quoting *Evans*, 88 P.3d at 1085).

[21]    *Id.* (quoting *Evans*, 88 P.3d at 1085).

parent; courts may take into account the relationship between a child and a third party."[22] Accordingly, although "[p]sychological parent status does not *entitle* a third party to custody[,] . . . this status can help a third party prove that it would be clearly detrimental to a child to deny third party custody."[23]

The superior court applied this framework throughout the proceedings and when issuing its decision on record. Counsel for both parties submitted briefing in October 2014 on standing and relevant third-party custody case law. Following a March 2015 settlement conference, the court in its findings of fact and conclusions of law implementing the parties' settlement agreement noted that the parties had stipulated to the "strong and heartfelt bond" between Dara's son and the Gishes, and that the Gishes had served as "the primary care givers of the minor child for a period in excess of five years." This stipulation and the court's conclusion that the Gishes served as primary care givers for the majority of the boy's life demonstrated the "significant connection" between the boy and the Gishes sufficient to establish standing to seek custody.[24]

The Gishes' standing to seek custody was further established by the court's later finding that the Gishes had achieved "psychological parent" status, a "more demanding" means of establishing standing than the significant connection test.[25] In its July 2015 order granting the Gishes interim custody, the court found that "[b]ased upon

---

[22]     *Id.* (citing *J.W. v. R.J.*, 951 P.2d 1206, 1211 (Alaska 1998), *overruled on other grounds by Evans*, 88 P.3d at 1085 n.34 (requiring the clear and convincing evidence standard in third-party custody cases)).

[23]     *Id.* at 184 n.17 (emphasis in original) (citing *Buness*, 781 P.2d at 989 n.8).

[24]     *See Buness*, 781 P.2d at 986, 988 (holding that significant connection was "unquestionably" established when child lived with half-sister's father several days a week for approximately four years and continuously for about one year).

[25]     *Osterkamp*, 235 P.3d at 184 n.17 (quoting *Evans*, 88 P.3d at 1082).

the long and established relationship that exists between [Dara's son] and Howard and Helena Gish, and in conjunction with the professional opinion and recommendations of Dr. Alfred Collins," the Gishes "are the 'psychological' parents" of Dara's son. The court reiterated its finding that the Gishes are psychological parents in its July 2016 decision on record. In making these findings the superior court applied the correct legal standard to determine standing in a third-party custody case.

The superior court likewise required the correct standard of proof and applied the correct substantive legal standard. The court distinguished this case from custody cases between two biological parents where custody is determined in accordance with the child's best interests.[26] The court expressly noted that it was required to make findings under the clear and convincing evidence standard's "quite high burden," rather than under the preponderance of the evidence standard typically applied in custody disputes.[27] Citing a number of relevant third-party custody and visitation decisions,[28] the

---

[26] *Compare Ronny M. v. Nanette H.*, 303 P.3d 392, 401 (Alaska 2013) (noting that in a dispute between biological parents "[t]he superior court must determine custody in accordance with the best interests of the children" (citing AS 25.24.150(c)), *with C.R.B. v. C.C.*, 959 P.2d 375, 380 (Alaska 1998) (observing that "despite an inevitable sacrifice of children's best interests in cases where a nonparent can better serve those interests," the higher burden of showing that "a parent is unfit or that his or her custody is clearly detrimental" is necessary in third-party cases to avoid the danger of taking children from their parents simply because authorities personally disapprove of parents' lifestyles or limited means (citing *Carter v. Novotny*, 779 P.2d 1195, 1197 (Alaska 1989))), *overruled on other grounds by Evans*, 88 P.3d at 1085 n.34.

[27] *See Evans*, 88 P.3d at 1085 (requiring "heightened . . . clear and convincing evidence standard" in "initial custody contests between parents and non-parents" rather than preponderance of evidence standard used in custody cases between parents).

[28] The superior court relied on *Ross v. Bauman*, 353 P.3d 816 (Alaska 2015); *Osterkamp v. Stiles*, 235 P.3d 178 (Alaska 2010); *Evans v. McTaggart*, 88 P.3d 1078

(continued...)

superior court noted the extremely high burden the Gishes had to surmount to demonstrate that the child's welfare required them to have custody; they had to prove that "custody by the biological parent would be clearly detrimental to the child." The court conveyed this same standard to Dara at the beginning of the trial to ensure that she understood what the Gishes were required to prove and that she could effectively represent herself. The legal standard the court conveyed to the parties and applied in its decision comports with our established requirements; third parties seeking custody "must show by clear and convincing evidence that the parent is unfit" or that "the child would suffer clear detriment if placed in the custody of the parent."[29]

Because the superior court applied the correct legal framework and that framework appropriately balances the child's welfare against the fundamental right to parent, Dara's constitutional argument fails.

### C. The Superior Court Did Not Err In Its Custody Determination.

The superior court found the Gishes proved by clear and convincing evidence that Dara's son would suffer clear detriment if Dara were given sole custody. The court entered a number of findings supporting that determination. Its "primary finding" was that the boy has special educational, emotional, and psychological needs, including severe dyslexia. The court also found that: (1) the Gishes have undertaken a number of actions to meet the boy's special needs; (2) Dara cannot meet those needs, is unwilling to recognize those needs, has a history of not following through with the boy's care, and her failings are attributable not to a lack of resources but rather a lack of will; (3) the Gishes were the boy's primary parents for five years, they remain his

---

[28]    (...continued)
(Alaska 2004); *Todd v. Todd*, 989 P.2d 141 (Alaska 1999); and *Buness v. Gillen*, 781 P.2d 985 (Alaska 1989).

[29]    *Osterkamp*, 235 P.3d at 185 (quoting *Evans*, 88 P.3d at 1085).

psychological parents, and separating the boy from them would cause him emotional harm; (4) due to Dara's "severe hatred of her parents" her "actions are not dictated by the welfare of" her son, and if she has custody "she will do everything to terminate the relationship between the grandparents and the child," to her son's detriment; and (5) Dara has an unstable home-life. Dara challenges many of the court's controlling factual findings and its failure to address in its decision on record a number of facts and factors she considers relevant to the determination.

Dara first argues the superior court should have considered her son's purported preference to live with her. The court informed Dara at the trial's conclusion that, given her son's age and special needs, his preference would not "carry the day one way or the other." The court noted that in a custody case between parents it would be required under AS 25.24.150 to consider her son's preference if he were "of sufficient age and capacity to form a preference,"[30] but under that statutory analysis most judges would not consider her son sufficiently mature to develop an informed preference.[31] Given the boy was only ten years old at the time of trial and there was extensive evidence concerning his developmental delays, the court's finding that Dara's son was not "of sufficient age and capacity to form a preference" was not clearly erroneous. There thus was no need for the court to address in its decision on record the boy's purported preference, even assuming courts must consider that factor in the third-party custody context.[32]

---

[30] AS 25.24.150(c)(3).

[31] *See William P. v. Taunya P.*, 258 P.3d 812, 816 (Alaska 2011) (affirming finding that children aged 10 and 11 lacked sufficient age and capacity to form preference).

[32] *Cf. Park v. Park*, 986 P.2d 205, 207 (Alaska 1999) ("While a court (continued...)

Dara next challenges the superior court's finding that she has an unstable home. She contends her son was with her and her husband "for the entire summer and was healthy, reading on his own, [and] took to [her] husband to the point that he calls him Dad." The court relied on the following evidence for its unstable home-life finding: Dara married a man in Tennessee after knowing him for only 30 days; her husband has 5 children under the age of 11 by 3 different women yet has visitation with none; and her husband "exhibited explosive anger," cursing in court at counsel and the parties, all in front of Dara despite her earlier testimony that she suffered from post-traumatic stress disorder. The court found that behavior was not "an indication that the biological mother . . . comes from a stable home environment at this point." Dara argues no adverse inference should be drawn from her husband's outburst because he "was asked relentlessly about his children that are not part of this case and [he] asked nicely numerous times that they leave his children out of it but the[y] beat on him about it until he did have that outburst," and "anybody when pushed enough would have done the same thing." But the superior court was entitled to draw reasonable inferences from the husband's testimony and demeanor at trial;[33] it is not unreasonable to be concerned that

---

[32]    (...continued)
determining custody [between biological parents] must always consider each of these [AS 25.24.150(c)] factors, it need not refer to all of them in explaining its custody decision."); *Duffus v. Duffus*, 932 P.2d 777, 779 (Alaska 1997) ("While trial courts are encouraged to state all findings in their written orders, they are not required to do so as long as the basis for their decisions is clear from the record and susceptible to review.").

[33]    *See Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1136 (Alaska 2001) ("The significance of live testimony and demeanor evidence has been long recognized. Blackstone explained that, '[by] examination of wittnesses *viva voce*, in the presence of all mankind, . . . and this [method] only, the persons who are to decide upon the evidence have an opportunity of observing the . . . behaviour. . . and inclinations of the witness.' " (first omission and first and second
(continued...)

if the husband is unable to control his temper in a courtroom he may also be unable to do so in a child's presence. The court's finding that Dara had an unstable home-life was reasonable and grounded in testimony; it was not clearly erroneous.

Dara next challenges the superior court's findings that she is unwilling to recognize her son's special needs and is ill-equipped to meet his needs. She argues that she and her husband have done everything in their power to care for her son, and that she failed to enroll her son in therapy during the summer of 2016 — despite her husband's insurance providing coverage — only because the boy was with her for a relatively short time, making treatment impractical. But the superior court relied on Dara's own actions and testimony, which contradict the explanation she offers on appeal. When the court agreed to permit her son to remain in Tennessee for a summer in the face of concerns the Gishes raised, the court acknowledged that the boy "may lose some of the progress he has gained through the therapy he has completed." Despite these misgivings the court allowed Dara to take custody for the summer because she and her husband assured the court they had enrolled the boy in summer therapy. "Despite that agreement," the court noted at trial, Dara's son never attended the courses, and Dara's only explanation was that "his spot got taken by someone else."

Referencing tests indicating Dara's son was at a first- or second-grade level when he should have been entering the fifth grade, the court asked Dara whether she recognized her son's developmental delays and whether she thought they were a real problem. Dara responded by minimizing his needs, equivocating, and noting that many of her family members had some sort of delay. When asked whether she had read the expert reports on her son and whether she believed they had validity, Dara again

---

[33] (...continued) alterations in original) (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES *373)).

equivocated. She focused on her belief that Dr. Collins's report was biased, noted that her father thought she had dyslexia simply because she did not enjoy reading, and informed the court that a friend with dyslexia told her people sometimes just grow out of it. When the court asked Dara what she had done over the summer to address her son's dyslexia, she replied only that she had been working with him and working on his reading. This testimony, and Dara's failure to provide her son with therapy over the summer as she had assured the court she would, support the court's decision.[34] Its finding that Dara is unwilling and ill-equipped to address her son's needs is not clear error.

Dara also argues that her admittedly "very unhealthy relationship" with her parents is not her fault and that it should not be held against her. She contends they physically and emotionally abused her, but denies she will put her antipathy toward them above her son's needs; she has "no intention of cutting [her] parents out of [her son's] life as he does love them." Regardless of fault, our inquiry centers on the child's welfare; the relevant question is which party is more likely to detrimentally cut the boy off from an emotionally and psychologically important relationship.[35] The superior court found that the Gishes are psychological parents to Dara's son, and we have stated that "courts may take into account the relationship between a child and a third party in

---

[34] *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009) ("When reviewing factual findings . . . we will not re-weigh evidence when the record provides clear support for the trial court's ruling; it is the function of the trial court . . . to judge witnesses' credibility and to weigh conflicting evidence." (quoting *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008))).

[35] *See Osterkamp v. Stiles*, 235 P.3d 178, 186 ("[W]hen a child's 'strongest psychological bonding' is with third parties, 'it would be detrimental to [the child] to destroy those bonds.' " (second alteration in original) (quoting *Todd v. Todd*, 989 P.2d 141, 143 (Alaska 1999))).

determining whether awarding custody to the legal parent . . . would result in clear detriment to the child."[36] The superior court also found that, if granted sole custody, Dara would "do everything to terminate the relationship between the grandparents and the child," to her son's detriment.

Evidence in the record supports this finding. The parties, stipulating to the "strong and heartfelt bond" between Dara's son and his grandparents, agreed at a March 2015 settlement hearing that Dara would have primary custody of the boy, and that the grandparents would have regular visitation so he would not be traumatized by an abrupt end to contact with them. But less than two weeks after this settlement, Dara "intentionally did abscond" from the state, cutting off all contact between the boy and his grandparents until the Gishes tracked Dara down several months later. When the court inquired why Dara had cut off all contact, she responded that she asked her son whether he wanted to talk to the Gishes and he said "no," and that she was not going to otherwise contact the Gishes because of her dislike for them. And in July 2015 Dr. Collins testified that Dara's decision to move away and cut off contact was "detrimental to [the boy's] welfare and has likely created significant trust issues between [the boy] and [Dara] that may lead to further difficulties in their relationship in the future." Given this evidence and the superior court's responsibility to judge witnesses' credibility,[37] it was not clear error to find that Dara, if given sole custody, would terminate her son's relationship with the Gishes and that such action would be detrimental to the boy's welfare.

---

[36]     *Id.* at 185 (citing *J.W. v. R.J.*, 951 P.2d 1206, 1211 (Alaska 1998), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1070, 1085 n.34 (Alaska 2004)).

[37]     *See In re S.K.L.H.*, 204 P.3d at 325 (quoting *Tessa M.*, 182 P.3d at 1114).

Dara next suggests the bond and "psychological parent" status between her son and the Gishes should be discounted because she has been "fighting to get [her] child back since 2012," but the Gishes have used litigation "so that they would be able to keep [her] son long enough to validate their claim" to psychological parent status. We have held that "the relevant point in time for establishing psychological parent status is the time when a complaint for custody or visitation is filed."[38] By January 2014, when this action was initiated, the Gishes had served as primary care givers for almost five of the boy's eight years. The superior court expressly referenced this five-year period in finding that the Gishes had established "psychological parent" status. Relying on the five-year period ending on the date the Gishes filed their complaint for custody was not legal error.[39]

Dara finally argues the superior court's order should be reversed because the Gishes have "an unhealthy relationship with [her] child" and a "severely unstable home." Among the allegations Dara raises to support these contentions are: Helena Gish at times allows the boy to sleep in her bed; the Gishes "sleep in separate bedrooms," a sign of instability; Helena is scared of Howard; and the Gishes are "both severely deceitful and manipulative." These factual allegations are necessarily either new on appeal or were litigated at trial. If the former, we will not consider arguments based on

---

[38]     *Osterkamp*, 235 P.3d at 188.

[39]     We note that it is unlikely the superior court's analysis would have changed if it had assessed whether the Gishes had established psychological parent status by the time Dara commenced litigation in 2012, rather than by the time the Gishes filed their complaint 18 months later, and a finding that they had would not have been clearly erroneous. By 2012 the Gishes had served as primary care givers and legal guardians for approximately half the boy's life.

those allegations.[40]  If the latter, given that Dara's challenges to the superior court's controlling factual findings, as discussed above, do not demonstrate clear error, any conflicting contentions argued on appeal concerning the relative stability and felicity of the Gishes' home are insufficient to overturn the court's clear detriment finding.[41]  As noted above the court correctly relied on the third-party custody legal framework we have established.  And as outlined in this section the court exercised a high degree of care in its role as fact-finder, entering detailed findings under those exacting third-party custody standards.  The court did not err in awarding the Gishes joint legal and primary physical custody.

## V.    CONCLUSION

We AFFIRM the superior court's decision.

---

[40]      *See Reilly v. Northrop*, 314 P.3d 1206, 1214 (Alaska 2013) ("We 'will not consider on appeal new arguments which . . . "depend on new or controverted facts," . . . unless the new issue raised establishes plain error.' " (quoting *Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 418-19 (Alaska 2001))).

[41]      *See In re S.K.L.H.*, 204 P.3d at 325 ("[W]e ordinarily will not overturn a trial court's finding based on conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling . . . ." (quoting *Tessa M.*, 182 P.3d at 1114)).