*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALEXANDER S. DAVES, | ) | |
| | ) | Supreme Court No. S-16751 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-08-07051 CI |
| v. | ) | |
| | ) | O P I N I O N |
| ALEXANDREA MCKINLEY and | ) | |
| KATHRYN LEDLOW, | ) | No. 7269 – August 10, 2018 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Alexander Daves, pro se, Youngstown, Ohio, Appellant. No appearance by Appellees Alexandrea McKinley and Kathryn Ledlow.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

The superior court awarded custody of a child to her maternal grandmother. When the father later moved for a modification of custody, the court denied the motion on the ground that there had been no substantial change in circumstances. On appeal the father argues that he should not have been required to show a substantial change in

circumstances because the award of custody to the grandmother had been only temporary and he remained entitled to the parental preference.

We conclude that the father's argument has merit. The superior court's oral remarks and written order granting custody to the grandmother, when read together, indicate an intent that there would also be a transitional period during which the parties would see how the child adapted to spending more time with her father, leaving open the possibility that the transition would result in permanent custody with the father. We conclude that in the absence of a grant of permanent custody to the grandmother, the father remains entitled to the parental preference, and the grandmother continues to have the burden of proving that the preference should be overcome.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Alexander Daves and Alexandrea McKinley met in Anchorage in the fall of 2004. They dated for approximately a year and briefly lived together in late 2005 and early 2006, first with her parents and then with his. They separated before the birth of their daughter, V., in October 2006.

At first Alexandrea was V.'s primary caregiver, and Alexander had regular visits. In April 2008, prompted by a dispute over visitation, Alexander filed a motion for interim custody. In August the court entered a custody order based on the parties' agreement that they would share legal custody, Alexandrea would have primary physical custody, and Alexander would have weekend visitation. The parties largely followed this schedule over the next several years, with some interruptions due to Alexandrea's temporary moves with V. to Metlakatla.

In 2011 Alexander was admitted to medical school in Pennsylvania. In a custody order that June the superior court continued the prior custody arrangement — joint legal custody and primary physical custody with Alexandrea — but ordered that

Alexander should have "reasonable visitation as his studies and the parties' finances permit," as well as "at least twice weekly phone contact."

A series of custody orders in 2013 recognized the parties' continuing difficulties with visitation: Alexander alleged that Alexandrea was refusing to allow his visits and was leaving V. largely in the care of Kathryn Ledlow, Alexandrea's mother.[1] In September 2013 the court ordered a custody investigation. The report did not make any recommendations because of the investigator's limited contact with the parties, but among its conclusions was that "[i]t appears likely that the maternal grandmother [Kathryn] has been the person providing much of [V.'s] care in Anchorage." The superior court issued an order noting the report's completion and advising the parties that it would take no action on the report unless one of them moved to modify custody; neither one did.

The parties appeared to get along with little judicial involvement over the next three years. Alexander had little contact with Alexandrea; his visits with V. were facilitated through Kathryn.

### B. Proceedings

Two custody proceedings in 2016 and 2017 are central to this appeal.

#### 1. July 2016 order on Alexander's motion to modify custody

In April 2016 Alexander filed a motion seeking primary physical custody of V. He identified several significant changes in his life: He was moving to Ohio for his medical residency, expecting to live there for at least three years, and he and his girlfriend intended to buy a house. He also alleged that there had been "new [criminal] charges against [Alexandrea] which might be an indicator of her stability." The superior

---

[1] Although Kathryn did not formally intervene in this case, we have identified her as an appellee based on her participation in the trial court and role as a custodial non-parent.

court found these allegations inadequate to show a substantial change in circumstances affecting V.'s best interests, but, after Alexander filed a supplemental affidavit expanding on his allegations and alleging that Alexandrea had been leaving V.'s care entirely to Kathryn, the court scheduled an evidentiary hearing.

Alexander and Kathryn appeared at the hearing, but Alexandrea did not. No one had a lawyer. Kathryn testified that V. had been living with her for the past three years and that she did not know Alexandrea's present whereabouts. She testified that she would not allow Alexandrea to live with her because of her drinking, though "[w]hen she's doing okay, I'll let her visit with [V.]." According to Kathryn, Alexandrea had not spent a night with V. in three years; she testified that Alexandrea had "been around" — "visiting" the child in Kathryn's home — "probably about 35, 40 percent" of the time.

Alexander testified about his most recent in-person visits with V., including four overnights a week during a month-long return to Alaska in October 2014 and a two-week visit on the east coast in the spring of 2015. He testified that he had been exercising his right to weekly visitation via Skype. He also testified about his new home, explaining that he was ready for V. to move in with him permanently.

The court noted its assumption that V. had "bonded greatly with" Kathryn because she had been "essentially the primary caregiver for three years"; Kathryn interjected that it had actually been for nine-year-old V.'s entire life, other than about six months when she was in Metlakatla with Alexandrea. The court asked Alexander "why [it] should . . . switch this living arrangement given that [V.] has lived with her grandmother essentially her entire life." Alexander responded that all prior custody orders and agreements had been based on the misperception that V. lived with her mother. The court acknowledged that Alexandrea had misrepresented her role in her child's life and that the court had been unaware that Kathryn had always been the primary caregiver. The court agreed this was "a little bit troubling."

The court also noted its concern, however, that moving V. from her grandmother's home to live with a father she had rarely seen in person would be difficult, especially if the change were made abruptly. The court observed that "a more prudent path for [V.] is to have her spend more time in Ohio during the summers and keep open the possibility that she becomes more comfortable with the arrangement in Ohio and more comfortable with the idea of living with [Alexander] there during the school year." The court said that V. "deserves a transition, at a minimum, and should spend more time with [Alexander] during the summer in preparation for the possibility of spending the school year there." But the court cautioned it was possible that the "transition, not the transition, but the switch, to her living [with Alexander] during the school year never comes about because she is uncomfortable with that prospect." The court disclaimed any suggestion "that there's something wrong with [Alexander], or [his girlfriend] or with the home that [they] would create for [V.]"; the court was "more concerned with the child being not capable of making the transition very easily." The court said it would therefore "prefer to revisit the living arrangement after we see [V.'s] response to Ohio and when she gets a tiny bit older. And prepare her for the possibility that she's [going to] move to Ohio."

The discussion turned to the logistics of V.'s travel. The court said it "would like to . . . have [V.] spend the remainder of the summer in Ohio with [Alexander]" and asked Alexander and Kathryn to work out the details, which they agreed to do. The court concluded that it "would explore a year from now – well, like next May, sort of revisit this."

The court's written order, dated July 8, 2016, was entitled "First Final 2016 Child Custody Order." In it the court discussed the standard applicable to permanent

grants of custody to non-parents[2] and found "by clear and convincing evidence that it would be detrimental to [V.] to be in the primary physical custody of either of her parents, although for very different reasons." The court found that Alexandrea was "currently unwilling and probably incapable of parenting [V.]" because of her alcohol abuse. As for Alexander, the court did not find that he was unable to parent; rather, it found that "[i]t would be detrimental to [V.] to reside with [Alexander] at this time . . . because he has not been playing that role for some years because of his absence from Alaska while he pursues medical training." The court noted that it "would begin that transition [to Alexander's custody] now" if Alexander were "in Anchorage so that the Court could reintroduce [V.] to life in her father's home more gradually." "But the prospect of simply sending [V.] to [Alexander] and removing her from [Kathryn], the sole source of stability and dependable care that she has known, would be damaging to her." Alexander subsequently filed two documents which were construed as motions to reconsider and were denied. Alexander did not appeal the July 2016 order.

### 2. June 2017 order on Alexander's motion to modify custody

Alexander filed additional motions in December 2016, seeking physical custody of V. and an order for a custody investigation. The superior court ordered a limited custody investigation in March 2017, and the report was completed in May. The report made no recommendations about custody.

In June the court issued an order denying Alexander's December motion. Citing *Abby D. v. Sue Y.*,[3] the court determined that Alexander was no longer entitled to

---

[2]    *See Evans v. McTaggart*, 88 P.3d 1078 (Alaska 2004); *Turner v. Pannick*, 540 P.2d 1051 (Alaska 1975).

[3]    378 P.3d 388, 392 (Alaska 2016) ("*In its initial resolution of a custody dispute between a biological parent and any third party*, including a grandparent, the
(continued...)

a biological parent's preference because the court had awarded Kathryn permanent custody in its July 2016 order, and that Alexander failed to meet his burden of proving there had been a substantial change in circumstances justifying a hearing on whether the existing arrangement should be modified. The court rejected Alexander's contention that the court had promised to revisit custody in May 2017, concluding that it had agreed only to revisit the logistics of the 2017 summer visit. The court found that its earlier comments did not "warrant further review of custody."

Alexander timely appealed the June 2017 order.

## III. STANDARD OF REVIEW

The superior court has broad discretion in custody awards.[4] In this case, the superior court's 2017 denial of Alexander's motion for modification of custody turns on interpretation of the July 2016 custody order. We recognize that "the court that entered the original order is in the best position to interpret its own order," and we therefore "review the superior court's interpretation of its own order for abuse of discretion."[5]

---

[3]     (...continued)
court must prefer the biological parent. . . . But '[w]hen the non-parent has already been granted permanent custody, the parental preference drops out in subsequent modification proceedings.' " (emphasis added) (second alteration in original) (quoting *Evans*, 88 P.3d at 1085 n.32)).

[4]     *Dara v. Gish*, 404 P.3d 154, 159 (Alaska 2017).

[5]     *Del Rosario v. Clare*, 378 P.3d 380, 383-84 (Alaska 2016).

## IV. DISCUSSION

Alexander raises a number of challenges on appeal to the permanent award of V.'s custody to Kathryn.[6] We do not need to reach most of them, because we conclude, for the reasons that follow, that the custody award was temporary and Alexander remains entitled to the biological parent preference.

### A. It Was An Abuse of Discretion To Interpret The July 2016 Custody Order As An Order For Permanent Custody.

"In its initial resolution of a custody dispute between a biological parent and any third party, including a grandparent, the court must prefer the biological parent."[7] Under this preference, the biological parent prevails unless the non-parent shows "by clear and convincing evidence that the parent is unfit or that the welfare of the child requires the child to be in the custody of the non-parent."[8] If the non-parent is granted permanent custody, however, then "the parental preference drops out in subsequent modification proceedings."[9] "At that point any modification motion is subject to the

---

[6]    In addition to challenging the court's application of the parental preference, Alexander argues that the court's award of custody to Kathryn violated his constitutional rights and the evidentiary rules and that he was entitled to a hearing on modification of custody under a "substantial change in circumstances" standard.

[7]    *Abby D.*, 378 P.3d at 392 (citing *Turner*, 540 P.2d at 1053-54).

[8]    *Dara*, 404 P.3d at 161 (quoting *Osterkamp v. Stiles*, 235 P.3d 178, 185 (Alaska 2010)).

[9]    *Abby D.*, 378 P.3d at 392 (quoting *Evans v. McTaggart*, 88 P.3d 1078, 1085 n.32 (Alaska 2004)).

usual test of AS 25.20.110(a), meaning that the custody decree will be modified only 'if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child.' "[10]

Alexander argues that the superior court erred in its June 2017 order when it failed to apply the biological parent preference and determined that Alexander now bore the usual burden of a non-custodial parent moving to modify the existing custody arrangement. We agree with Alexander's argument. We have observed that "[c]ourts should make clear whether a grant of nonparental custody is temporary or permanent, and ensure that they carefully warn a parent that a hearing may have the latter result."[11] Having reviewed the hearing and the July 2016 order on Alexander's motion to modify custody, we conclude that whatever the court's intent, it was not made clear to Alexander that the court was then making a permanent grant of custody to Kathryn. Alexander could reasonably believe that the court was making a temporary custody order that would be subject to de novo review in May 2017.

We have faced similar issues in the past. In *Britt v. Britt* the parties agreed as part of the initial custody decree that the grandparents would have custody of their child.[12] After an evidentiary hearing six months later, the superior court denied the mother's motion that she be granted custody instead.[13] On appeal the mother argued that the grandparents should have had the burden at the hearing of overcoming the *Turner*

---

[10]     *Id.* (quoting *Hunter v. Conwell*, 219 P.3d 191, 196 (Alaska 2009)).

[11]     *C.R.B. v. C.C.*, 959 P.2d 375, 381 n.12 (Alaska 1998), *overruled on other grounds by Evans*, 88 P.3d 1078.

[12]     567 P.2d 308, 309 (Alaska 1977), *overruled on other grounds by Evans,* 88 P.3d 1078.

[13]     *Id.*

biological parent preference,[14] as the prior award was only temporary; but the father argued that the prior award was permanent and the subsequent hearing was simply a modification proceeding at which the moving party, here the mother, bore the burden of proof.[15] Although noting that both parties had apparently intended the initial award to be permanent, our decision centered on the fact that the superior court, in making that award, had sua sponte ordered a six-month review "to see if there's been any changes in the status of either parent or the grandparents."[16] We held that because "the court indicated a desire to review the initial decision in six months without the necessity of any [motion for modification]," the order was best characterized as temporary rather than permanent, and the mother remained entitled to the *Turner* preference until a permanent order was made.[17]

We reached a different conclusion in *Abby D. v. Sue Y.*[18] In that case the mother moved to modify custody nine months after a trial at which the superior court had awarded permanent custody to the grandparents; like the parent in *Britt*, the mother argued that the prior award had been merely temporary and she remained entitled to the *Turner* preference.[19] The superior court rejected her argument and we affirmed, concluding that the superior court had properly applied the *Turner* preference at the initial trial while making it clear that the resulting custody award was "permanent and

---

[14]    *See Turner v. Pannick*, 540 P.2d 1051, 1055 (Alaska 1975).

[15]    *Britt*, 567 P.2d at 310.

[16]    *Id.* at 309-10.

[17]    *Id.* at 310.

[18]    378 P.3d 388 (Alaska 2016).

[19]    *Id.* at 391-92.

final."[20]  We rejected the mother's suggested comparison to *Britt*, in which the superior court had expressly scheduled a six-month review of its initial custody order; we concluded that the superior court's observations in *Abby D.* that its award of custody to the grandparents was "not written in stone" and "doesn't mean it has to happen forever" simply reflected the fact that permanent awards are subject to motions for modification.[21]

We conclude that this case is more analogous to *Britt* than to *Abby D.* Although the July 2016 custody order applied the *Turner* preference and made what appeared to be a permanent award of custody to Kathryn, the proceedings leading up to that order and even some language of the order itself convince us it must be considered temporary.

Kathryn never sought to formally intervene in the case, nor did she file her own motion for custody, as she may have been entitled to do.[22]  The court's July 2016 custody order was prompted by Alexander's motion for modification of custody.  The court's first order on the motion assumed that it presented the usual custody dispute between biological parents — that is, whether primary physical custody should remain where the court assumed it was, with the child's mother, Alexandrea.  After Alexander alleged that Alexandrea was actually not involved in V.'s care, the court's next order, scheduling a hearing, referred not to the standard for granting permanent custody to a non-parent but rather to the standard for ordering non-parent visitation.[23]  Alexander had

---

[20]     *Id.* at 393.

[21]     *Id.* at 393-94.

[22]     *See Elton H. v. Naomi R.*, 119 P.3d 969, 979 (Alaska 2005) ("[A] court may award custody to a non-party who would have been entitled by right to intervene as a party in the custody proceedings pursuant to Alaska Civil Rule 24(a).").

[23]     The superior court quoted from *Ross v. Bauman*, 353 P.3d 816, 828-29
(continued...)

-11-                                    **7269**

not yet been advised that his motion could result in a permanent award of custody to Kathryn. As we observed in *Elton H. v. Naomi R.*, "[a]warding custody to a non-party may implicate due process concerns when a party lacks notice that such an award is being considered."[24]

The evidentiary hearing is described in more detail above. In brief, after it became clear that the court had been misled and that Kathryn, not Alexandrea, had actually been exercising primary custody of V. for years, the court's comments indicated that it was seriously considering a gradual transition to Alexander's care in Ohio. Though wanting to avoid an "abrupt[]" change, the court noted "a more prudent path": "to have [V.] spend more time in Ohio during the summers and keep open the possibility that she becomes more comfortable with the arrangement in Ohio and more comfortable with the idea of living with [Alexander] there during the school year." The court reiterated several times that there would be an extended experimental period: "[V.] should spend more time with [Alexander] during the summer in preparation for the possibility of spending the school year there"; "to sort of explore her reaction to living a long period of time in Ohio, I would prefer to see her . . . spend the remainder of the summer in Ohio but return here to Alaska, and then we revisit the living arrangement after we see her response to Ohio and when she gets a tiny bit older"; this would "prepare her for the possibility that she's going to move to Ohio for fifth grade or sixth grade or junior high." And toward the end of the hearing the court said it "would explore

---

[23]    (...continued)
(Alaska 2015), where we stated that a grandparent seeking visitation over the wishes of an "otherwise fit parent[]" "must prove by clear and convincing evidence that it is detrimental to the child to limit visitation with the third party to what the child's otherwise fit parents have determined to be reasonable."

[24]    119 P.3d at 979.

a year from now — well, like next May, sort of revisit this," including both Alexandrea's involvement with V.'s care and, more importantly, V.'s "relationship with her grandmother."

It was only in the court's subsequent written order that it cited the law that applies to a grant of permanent custody to a non-parent and found that Kathryn should have custody of V.[25] But the order can still be read as consistent with the court's oral remarks; it reads, "It would be detrimental to [V.] to reside with [Alexander] *at this time. . . . If he was in Anchorage so that the Court could reintroduce [V.] to life in her father's home more gradually, *then the Court would begin that transition now.*"[26] The order reaffirms the court's oral finding that it would be too damaging to V. to simply change custody abruptly from Kathryn to Alexander. The order thus appears to keep alive the idea of a transitional period as an alternative to an immediate modification of physical custody.

We conclude that when Alexander next moved for modification of custody in November 2016, he could have reasonably believed that the July custody award to Kathryn was temporary because they were in an experimental phase, exploring the possibility of a gradual transition to his custody. We give deference to the superior court's contrary interpretation of its own order[27] — in denying Alexander's November motion the court believed it had already resolved the issue of permanent custody,

---

[25] At the evidentiary hearing the court had mistakenly informed Alexander that he bore "the burden of proving that the change [in custody] should occur." The court's written order, however, correctly stated the burden on the non-parent to prove by clear and convincing evidence that awarding custody to the parent would be clearly detrimental to the child.

[26] Emphases added.

[27] *Del Rosario v. Clare*, 378 P.3d 380, 383-84 & nn.10-11 (Alaska 2016).

eliminating Alexander's right to the biological-parent preference.  But our overriding concern is with Alexander's right to clarity on the issue.[28]

In interpreting the court's July 2016 order we take into consideration other parts of the record, including the court's oral remarks at the hearing to the extent they may clarify the written order.[29]  We conclude that the court's oral remarks and written order read together, as in *Britt*, indicate an intent to create a temporary custody arrangement subject to further review the next May and perhaps beyond.[30]  Interpreting the order as permanent and dispositive of Alexander's parental preference was an abuse of discretion.  The parental preference therefore did not drop out,[31] and Kathryn continues to have the burden of proving by clear and convincing evidence that the preference should be overcome.[32]

---

[28]     *Elton H.*, 119 P.3d at 979-80 (holding that one of four conditions limiting trial court's discretion to award custody to non-party is "notice that such an award is being considered"); *C.R.B. v. C.C.*, 959 P.2d 375, 381 n.12 (Alaska 1998) ("Courts should make clear whether a grant of nonparental custody is temporary or permanent, and ensure that they carefully warn a parent that a hearing may have the latter result."), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078 (Alaska 2004).

[29]     *Del Rosario*, 378 P.3d at 384 ("All parts of an order are read together and are considered as a whole," and "[t]he record [also] should be taken into consideration in determining the intent, scope[,] and effect of an order." (second and third alterations in original); *Brandal v. Shangin*, 36 P.3d 1188, 1195-96 (Alaska 2001) ("[W]e look to both the oral comments and the written findings of fact and conclusions of law to clarify the scope of [an] order.").

[30]     *See Britt v. Britt*, 567 P.2d 308, 310 (Alaska 1977), *overruled on other grounds by Evans*, 88 P.3d 1078.

[31]     *See Abby D. v. Sue Y.*, 378 P.3d 388, 392 (Alaska 2016).

[32]     *See Dara v. Gish*, 404 P.3d 154, 161 (Alaska 2017).

## V. CONCLUSION

The order denying Alexander's motion to modify custody is REVERSED and the case is REMANDED for proceedings consistent with this opinion.